NATIVE ECOSYSTEMS COUNCIL, and Alliance for the Wild Rockies, Plaintiffs,

v.

Leslie WELDON, Regional Forester of Region One of the U.S. Forest Service, and United States Forest Service, an Agency of the U.S. Department of Agriculture, Defendants.

No. CV 11–99–M–DWM.

United States District Court, D. Montana, Missoula Division.

March 26, 2012.

Rebecca Kay Smith, Timothy M. Bechtold, Bechtold Law Firm, Missoula, MT, for Plaintiffs.

Andrew A. Smith, U.S. Department of Justice, Albuquerque, NM, Mark Steger Smith, Office of the U.S. Attorney, Billings, MT, for Defendant.

## ORDER

DONALD W. MOLLOY, District Judge.

The plaintiffs challenge the Custer National Forest's Beaver Creek Landscape Management Project. Both parties move for summary judgment and for the reasons set forth below both motions are granted in part and denied in part.

### BACKGROUND

The Forest Service's Record of Decision for the Project authorizes, among other things, 1,487 acres of commercial logging, 35.2 miles of road construction or reconstruction, and 8,054 acres of prescribed burning. The Project will take six to ten years to implement.

The plaintiffs challenge several aspects of the Project. They claim that the Project violates the National Forest Management Act ("NFMA") and the National Environmental Policy Act ("NEPA") because it does not adequately protect elk habitat, it fails to protect old growth, and is deficient for goshawk habitat. They also claim that the Forest Service violated NEPA by failing to timely disclose the potential need for stormwater discharge permits under the Clean Water Act and by failing to consult with state agencies regarding those permits.

The plaintiffs filed two administrative appeals with the Forest Service and lost them both. They then filed this lawsuit on July 8, 2011.

Merits aside, the defendants make two procedural arguments. First, they argue that the plaintiffs failed to exhaust many of the claims that they now raise in their complaint. Second, the defendants move to strike 15 exhibits that the plaintiffs filed in support of their motion for summary judgment because the exhibits are not part of the administrative record and because the plaintiffs did not timely move to supplement the record.

As to the plaintiffs' motion [1], the Forest Service did not violate NEPA or NFMA by: (1) failing to apply the Plan's definition for Elk Hiding Cover or (2) failing to include a specific elk-habitat standard in the Plan. But the Forest Service's analysis of elk habitat in the Final Environmental Impact Statement ("EIS") violates NEPA because the Service acted arbitrarily and capriciously in: (1) failing to explain why it analyzed road density only at the Project level and ranger-district level, (2) in failing to explain why it applied the road-density standard to only Forest lands, and (3) in failing to analyze road density during Project implementation. Moreover, the Forest Service violated NEPA regulations by: (1) failing to identify the stormwater discharge permits that it might need to obtain for the Project and (2) by failing to solicit comments on the permits from State agencies. As a result, those matters are remanded to the Forest Service so that it can prepare a supplemental environmental impact statement that addresses these deficiencies.

---

1. The plaintiffs raise several claims in their Second Amended Complaint that neither party addresses in its motion for summary judgment. Those claims are: Second Claim for Relief ("The Forest Service violates the Appeals Reform Act regulations by allowing Plaintiffs' administrative appeals to be decided by an officer subordinate to the officer required by the regulations."); Fourth Claim for Relief ("The Project violates the Endangered Species Act."); Fifth Claim for Relief ("The Custer Forest Plan violates the Endangered Species Act."); and Sixth Claim for Relief ("The Custer Fire Plan violates the Endangered Species Act.")

The parties stipulated that the motions for summary judgment would resolve all claims. Since the parties failed to move for summary judgment on these claims, they are deemed abandoned and the Court dismisses them with prejudice. *See Wildwest Inst. v. Bull*, 468 F.Supp.2d 1234, 1253 n. 7 (D.Mont.2006).

As to the defendants motion, and in addition to the issues above, the plaintiffs have exhausted their claims below. The defendants' motion as to that issue is denied.

The defendants' motion to strike 15 exhibits that the plaintiffs filed in support of their motion for summary judgment is granted.

### SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248, 106 S.Ct. 2505.

### REVIEW OF FOREST SERVICE ACTIONS

■ NFMA imposes both procedural and substantive requirements on the Service's management of national forests. *Hapner v. Tidwell*, 621 F.3d 1239, 1246 (9th Cir.2010). Procedurally, NFMA requires the Service to develop and maintain a comprehensive forest plan for each national forest. *Id.* (citing *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009)); 16 U.S.C. § 1604(a), (e). Once a plan is adopted, all subsequent agency actions must comply with that plan. *Id.* (citing *Ecology Ctr.*, 574 F.3d at 656). Substantively, NFMA requires the Forest Service to adopt regulations aimed at protecting forest habitat and diversity of wildlife, among other things. 16 U.S.C. § 1604(g)(3). The site-specific forest plans, in turn, must comply with those regulations. *Hapner*, 621 F.3d at 1246.

■ Neither NFMA nor its regulations " 'specify precisely how the Forest Service must demonstrate that its site-specific plan adequately provide for wildlife viability....' " *Lands Council v. McNair*, 629 F.3d 1070, 1081 (9th Cir.2010) (quoting *Lands Council v. McNair*, 537 F.3d 981, 992 (9th Cir.2008) (en banc), *overruled in part on other grounds as recognized by Am. Trucking Assns. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir.2009)). Consequently it is necessary to " 'defer to the Forest Service as to what evidence is, or is not, necessary to support wildlife viability analyses.' " *Id.* (quoting *Lands Council*, 537 F.3d at 992). The Service, for example, may use the so-called "habit-as-proxy" or "proxy-on-proxy" approaches. *Id.* (describing the two approaches). "Additionally, viability analysis that uses all currently available scientific data is considered sound." *Id.* (citing *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 762 (9th Cir.1996)). When the Service utilizes a proxy approach, it " 'nevertheless must both describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat.' " *Id.* (citing *Lands Council*, 537 F.3d at 987–88).

■ The court's role in reviewing the Service's action "is simply to ensure that the Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious' " under NEPA. *Lands Council*, 537 F.3d at 993. For instance, a review must ensure that the Service has not:

- relied on factors which Congress has not intended it to consider,
- entirely failed to consider an important aspect of the problem,
- offered an explanation for its decision that runs counter to the evidence before the agency, or

• offered an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Lands Council,* 537 F.3d at 993 (quoting *Motor Vehicle Mfrs. Assn., Inc. v. St. Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■ In other words, it is unnecessary to "impose bright-line rules on the Forest Service regarding particular means that it mast take in every case to show ... that it has met the NFMA's requirements." *Id.* at 993–94. Instead, "[T]he Forest Service must support its conclusions that a project meets the requirements of the NFMA and relevant Forest Plan with studies that the agency, in its expertise, deems reliable." *Id.* A court should "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Id.*

## ANALYSIS

## I. Elk habitat

The plaintiffs argue that the Forest Service's analysis of elk habitat violates NEPA and NFMA. In part they are right. The Forest Service's analysis of elk hiding cover (or "canopy cover") does not violate NFMA or NEPA. But its analysis of road density does violate NEPA. Thus that issue is remanded to the Forest Service so that it may draft a supplemental EIS that addresses the deficiencies.

## A. The Plan's Elk Hiding Cover definition

The plaintiffs argue that the Project violates NFMA and NEPA because the Forest Service did not apply the Plan's definition of Elk Hiding Cover when it assessed how the Project would impact elk habitat. The argument is not well taken because neither the Plan nor the Final EIS utilizes a standard for Elk Hiding Cover to which that definition should be applied.

The Plan defines "Elk Hiding Cover" as "Vegetation, primarily trees, capable of hiding 90 percent of an elk seen from a distance of 200 feet or less." But, as both parties readily acknowledge, the Plan does not set out a standard for Elk Hiding Cover. Nor does the Final EIS employ a standard that triggers the Elk Hiding Cover definition. The only notable standard in the Plan that relates to elk is that elk "will be managed in cooperation with state and Federal Agencies."[2] The Final EIS does not set out a standard for Elk Hiding Cover either.

Since neither the Plan nor the Final EIS contains or utilizes a specific standard for Elk Hiding Cover, the failure to apply a definition for Elk Hiding Cover does not violate the Plan. There is nothing in the Plan or the Final EIS to which that definition should (or could) be applied.

This case is distinguishable from *Happner,* where the Ninth Circuit concluded that the "Service's failure to measure elk cover as defined by the Gallatin Plan renders us 'unable to determine from the record that the agency is complying with the forest plan standard.'" 621 F.3d at 1250. There, the forest plan contained a meaningful hiding-cover standard: The

2. The Plan also mentions that the Service should minimize management activities during calving and wintering periods and protect elk wallows in Management Area G. Moreover, the Plan states that "[t]he forest will provide for the maintenance and improvement of habitats for [Habitat Indicator Species (Management Indicator Species)]. But the Service apparently classifies elk as a "Key Species," not a "Habitat Indicator Species."

Service was required to "[m]aintain at least two thirds of the hiding cover associated with key habitat components over time. Subsequent timber sale activity will be allowed after regeneration provides hiding cover." *Id.* Here, no such standard exists in the Plan or the Final EIS, so there is no reason for the Service to apply the Elk Hiding Cover definition.[3]

Whether the Service has violated NFMA by failing to include an elk-habitat standard in the Plan is a separate matter. That question is the basis of the plaintiffs' second elk-related argument.

### B. Elk-habitat standard

■ The plaintiffs argue that the Service has violated NFMA by failing to incorporate a specific elk-habitat standard into the Plan. Their argument is not persuasive.

As discussed earlier, neither NFMA nor its regulations specify how the Service must show that its forest plans adequately provide for wildlife viability and diversity. *Lands Council,* 629 F.3d at 1081. The Service need not create a specific habitat standard for every species that might be found on a particular forest. *See id.* But, when the Forest Service relies on a proxy to ensure a species' viability, it "must both describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat." *Id.* The court's only task is to ensure that the Service made no " 'clear error of judgment' that would render its action 'arbitrary and capricious' " under NEPA. *Lands Council,* 537 F.3d at 993.

Here, consistent with the *Lands Council* decisions, because the Plan contains no specific elk-habitat standard is not a per se

violation of NFMA (or NEPA). What matters is whether the Service evaluated elk viability and habitat for the specific project at issue and whether that evaluation is defensible.

### C. The Forest Service's analysis of elk habitat

The plaintiffs argue that, even if the Plan does not have to set out a specific standard for protecting elk habitat, the Service acted arbitrarily and capriciously when it analyzed the Project's effect on elk habitat. To a certain extent this argument is well taken—the Forest Service's analysis of road density in elk habitat violates NEPA.

The Plan does not contain a notable or specific standard for protecting elk habitat beyond the dictate that the Service must cooperate with federal and state agencies when managing elk.[4] Recognizing the Project could impact elk habitat, the Service "must both describe the quantity and quality of habitat that is necessary to sustain the viability of [elk] and explain its methodology for measuring this habitat." *Lands Council,* 629 F.3d at 1081.

To that end, the Service offered a detailed explanation of the quantity and quality of elk habitat necessary to ensure the viability of elk on the Forest. It framed its discussion in terms of "Security Areas" and offered two different ways to understand that concept: (1) "Security Areas based on Canopy Cover" (or "canopy-cover standard") and (2) "Security Areas based on Road Density" (or "road-density standard"):

- *Security Areas based on Canopy Cover*—Fish, Wildlife & Parks recommends that there should be no more

---

3. For the same reasons, this case is also distinguishable from this Court's decision in *Helena Hunter & Anglers,* 841 F.Supp.2d 1129. *See* Order 24 (doc. 26).

4. *See supra* note 1.

than a 33% reduction in security areas as defined by canopy cover > 40% as a result of treatment activities (12.28.2010). Security areas containing > 40% canopy cover were mapped pre and post treatment using R1 VMap and the reduction of canopy cover was described by alternative.

- *Security Areas based on Road Density*—Hillis et al 1991 and the 2005 Elk Management Plan recommend that an analysis area contain at least 30% of an area that is > 250 acres and more than 0.5 miles from an open motorized route. Security areas based on road density were mapped for the project area and described by alternative.

These "indicators" were based on recommendations from Montana Fish, Wildlife & Parks, as well as scientific studies from Christensen et al. (1993) and Hillis et al. (1991). In the Final EIS, the Forest Service explained: "These indicators were selected because they address the best science and/or were recommended for analysis by FWP. These indicators are used to show how proposed treatment is consistent with Forest Plan standards to maintain and improve habitat for big game."

While plaintiffs claim the Service failed to comply with these indicators when it analyzed the Project's potential effects on elk habitat, the Service, on the other hand, argues they are not enforceable standards—they are, instead, only aspirational recommendations, not criteria that the Forest Service must necessarily comply with.

### 1. The elk security-area "indicators"

■ The two so-called "indicators" are mandatory, enforceable standards.[5] NFMA requires the Forest Service to show that its plans and projects will protect wildlife viability. *Lands Council*, 629 F.3d at 1081. Where the Forest Service attempts to show that a particular species will be protected because its habitat will be protected (i.e., the "habitat-as-proxy" approach), it "must both describe the quantity and quality of habitat that is necessary to sustain the viability of the species in question and explain its methodology for measuring this habitat." *Id.* (quoting *Lands Council*, 537 F.3d at 987–88).

Apart from the measurements laid out in the two indicators, the Service never described the "quantity and quality of habitat that is necessary to sustain the viability of [elk]." *Id.; see also Ecology Ctr., Inc. v. Austin*, 430 F.3d 1057, 1070 (9th Cir.2005) ("The Forest Service does not explain how it can be certain that the Project complies with NFMA if the Project was not developed in accordance with the Standard."), *overruled on other grounds, Lands Council*, 537 F.3d 981. Nor did they explain why anything less than those measurements would adequately protect elk viability.

While Hillis warned that "[u]nquestioning adherence to these guidelines may lead to serious misapplications and should be avoided," the Forest Service nevertheless expressed that the guidelines apply to the Custer National Forest. In its Final EIS, when it wrote: "This Group recognized that Hillis et al. (1991) still represents the

---

**5.** At the risk of splitting semantical hairs, the language that the Forest Service used in its description of the "indicators" shows that they are standards, not indicators. An indicator is a variable that tends to show the existence of some fact or condition. "Security Areas based on Canopy Cover" and "Security Areas based on Road Density"—as conceptual variables—might indeed be indicators of viable elk habitat. But when, as here, measurable criteria are attached to an indicator, that indicator becomes a "standard"—i.e., "A criterion for measuring acceptability, quality, or accuracy," *Black's Law Dictionary* 1535 (Bryan A. Garner ed., 9th ed., West 2009).

best science and is applicable to the ... Custer National Forest." To now suggest that the "indicators" do not necessarily apply is misleading and flies in the face of the Final EIS's plain language.

■ Moreover, the Forest Service is not free to set aside the "indicators" as mere recommendations, since they were used "to show how proposed treatment is consistent with the Forest Plan standards to maintain and improve habitat for big game." When the Forest Service employs criteria to show a project's compliance with NFMA or a Forest Plan, it must comply with those criteria, regardless of whether they are labeled as "advisory." *See Ecology Ctr.*, 430 F.3d at 1069–70. Otherwise, the EIS is "misleading in violation of NEPA." *Id.*

Since the Service represented that it was using the so-called "indicators" to demonstrate the Project's compliance with the Plan, the facts here are distinguishable from *Ecology Center*, 574 F.3d 652, and *Oregon Natural Resources Council v. Lowe*, 109 F.3d 521, 527 (9th Cir.1997). In those two cases, the Ninth Circuit was tasked with determining whether "guidelines" or "recommendations" were binding. The court acknowledged that "an otherwise advisory document" becomes mandatory when it "has been clearly incorporated into a Forest Plan or other binding document." *See Ecology Center*, 574 F.3d at 660. But the court also stated that "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Id.* (citations and internal quotation marks omitted). In both cases, the court concluded that the guidelines and recommendations were not mandatory and were, instead, advisory because they used aspirational rather than mandatory language.

But, here, unlike in *Ecology Center* and *Oregon Natural Resources Council*, the Forest Service expressly stated that it was relying on the indicators in order to demonstrate its compliance with the Forest Plan. The facts here more closely align with those in *Ecology Center v. Austin*, where the Ninth Circuit held that advisory guidelines are mandatory when the Forest Service relies on them to demonstrate compliance with NFMA or a forest plan. *See* 430 F.3d at 1069–70. Moreover, as in *Ecology Center v. Austin*, here, "The Forest Service does not explain how it can be certain that the Project complies with NFMA if the Project was not developed in accordance with the [two elk security-area indicators]." *Id.* at 1070.

As was decided in *Ecology Center v. Austin*, the two elk security-area indicators are mandatory, enforceable standards.

## 2. The Forest Service's analysis of road density

■ The plaintiffs claim that the Forest Service's analysis of road density violates NEPA. This proposition is right in part. The Forest Service acted arbitrarily and capriciously: (1) by failing to explain why it did not use the elk-herd-home-range unit of analysis; (2) by failing to explain why it applied the road density standard to only Forest lands and not all lands, including private lands; and (3) by failing to analyze road density during Project implementation.

### a. The road-density standard and the Elk Hiding Cover definition

The plaintiffs first argue that the Forest Service misapplied the road-density standard ("Security Areas based on Road Density") because it did not utilize the Plan's Elk Hiding Cover definition. The argument collapses on examination.

The road-density standard stems from the 1991 Hillis study and the 2005 Elk Management Plan from Montana Fish,

Wildlife & Parks. As described in the standard, Hillis concluded "that security areas should be ≥ 250 acres in size, ≥ one half mile from an open road, and should comprise ≥ 30% of a valid analysis unit." The plaintiffs correctly observe that Hillis makes a fleeting reference to "hiding cover" in the abstract for his paper: "To provide a reasonable level of bull survival, each security must be a nonlinear block of *hiding cover* ≥ 250 acres in size and ≥ one-half mile from any open road." (emphasis added). But this is the only portion of the study that mentions the phrase "hiding cover." Hillis does not advance a standard for hiding cover, and his road-density standard is not dependent on a particular type of cover. In fact, he suggests that security areas may consist of a variety of cover types: "Effective security areas may consist of several different cover types if the block is relatively unfragmented." There is no indication that Hillis's research or his standard is dependant on the "Elk Hiding Cover" concept or a similar concept. Consequently the Service had no obligation to read that notion into its standard for "Security Areas based on Road Density."

### b. The road-density standard and Fish, Wildlife & Parks' canopy-cover recommendation

The plaintiffs claim that, even if the Elk Hiding Cover definition does not apply, the Project still violates the standards. Specifically, they argue:

> [E]ven if the agency uses the FWP definition of elk hiding cover, it admits that there will be a reduction of 547 acres of hiding cover, FS030962, or a reduction from 26% to 22% hiding cover, FS002922 in the Project Area as a result of the Project. This reduction in hiding cover was never considered in the agency's analysis of security block percentage under the Hillis standard. Certainly, reducing hiding cover from 26% to 22%

violates the Hillis standard that requires a minimum of 30% of an area as hiding cover.

The problem with this argument is that it misinterprets the road-density standard—that is, the standard based on Hillis's study—and then conflates it with the canopy-cover standard. The Hillis's road-density standard does not include a hiding-cover element. Indeed, Hillis remarked that security areas may consist of a variety of cover types.

While the road-density standard does not require the Forest Service to consider "canopy cover," the canopy-cover standard does. That standard requires the Forest Service to not reduce, by more than 33%, areas that contain more than 40% canopy cover. Importantly, this standard does not impose a size requirement for areas with greater than 40% canopy cover. They do not, for example, have to be greater than 250 acres in size or constitute 30% of the Project Area (or any other area).

The plaintiffs' argument is ill begotten because neither the road-density standard nor the canopy-cover standard requires that 30% of an area must contain canopy cover greater than 40%. The only requirement is that the Project should not result in more than a 33% reduction of areas with 40% or more canopy cover. The plaintiffs have not argued nor shown that the defendants violated the canopy-cover standard. As explained below, however, it did misapply the road-density standard.

### c. Unit of analysis for the road-density standard

The plaintiffs claim the Forest Service used the wrong unit of analysis when it applied the road-density standard. This argument is predicated on the proposition that the Forest Service should have ap-

plied the standard to the "elk herd home-range" instead of applying it to the Project Area and the entire Ashland Ranger District. Regardless of whether the Forest Service used the appropriate unit of analysis, it acted arbitrarily and capriciously by failing to explain why it did not use the elk herd home-range unit of analysis.

The Ninth Circuit considered a similar situation in *Idaho Sporting Congress v. Rittenhouse,* 305 F.3d 957 (9th Cir.2002). An issue in that case was whether the Forest Service had used the correct unit of analysis when it analyzed the cumulative effects of a timber sale. The Circuit noted that "[o]rdinarily an agency has the discretion to determine the physical scope used for measuring environmental impacts." *Idaho Sporting Cong.,* 305 F.3d at 973 (citations omitted). But, "[T]he choice of analysis scale must represent a reasoned decision and cannot be arbitrary." *Id.* (citations omitted). In *Idaho Sporting Congress,* the Forest Service chose a species' home range as the unit of analysis for its cumulative effects, despite "detailed and well-supported conclusions of its own scientists that cumulative effects analysis of the species at issue '*must* be addressed at a landscape scale.'" *Id.* at 973 (quoting the EIS). The court held that the EIS must explain why the home-range scale was chosen over the recommended landscape scale. *Id.* at 973–74. Since the EIS did not set out that explanation, the Forest Service had to "prepare a new or supplemental EIS containing a reasoned discussion of its choice of cumulative effects area. . . ." *Id.* at 974.

A similar error exists here. Hillis—the Forest Service's own scientist—concluded that the unit of analysis for the road-density standard should be the "elk herd home-range":

> To be biologically meaningful, analysis unit boundaries should be defined by the elk herd home-range (Edge et al. 1986),

and more specifically by the local herd home-range during hunting season. Typically, the hunting season home-range includes the local herd transitional-range and at least the upper edge of winter range.

In the Final EIS, the Service repeatedly said that Hillis's research represents the best available science. Nevertheless, it disregarded Hillis's conclusion and applied the road-density standard at two other scales: the Project Area, where it analyzed direct and indirect effects, and the Ashland Ranger District, where it analyzed the cumulative effects. Even so, it did not explain in the Final EIS why it chose these two units of analysis over the elk herd home-range.

The Service explains in its briefing that it did not use the elk herd home-range unit of analysis because "there have been no identified elk herd home range units, and elk on the District 'are non-migratory.'" Regardless of whether that explanation holds water, it is too little, too late. An afterthought of litigation does not remedy the failure to make a reasoned decision in the Final EIS. *See Idaho Sporting Congress,* 305 F.3d at 973–74. As a result, the public did not have an opportunity to comment on the explanation given in a brief, as it would to an explanation provided in a Final EIS.

The Forest Service acted arbitrarily and capriciously, and in violation of NEPA, when it failed to explain why it did not apply use the elk herd home-range as its unit of analysis for analyzing road density. The issue is remanded to the Forest Service so that it may prepare a supplemental EIS containing a reasoned discussion of why it used the Project Area and Ashland Ranger Districts as units of analysis rather than the elk herd home-range. *See id.* at 974.

#### d. Lands analyzed under the road-density standard

The plaintiffs claim that the Forest Service incorrectly applied the road-density standard to only Forest lands and not adjacent private lands, as required under the Hillis standard. For similar reasons as those above, the Forest Service acted arbitrarily and capriciously by failing to apply the standard to private lands or otherwise explain why it should not be applied to private lands.

Both this Court and the Ninth Circuit have addressed similar questions involving the Service's failure to analyze private lands. *See Native Ecosystems Council v. U.S. Forest Serv.,* 418 F.3d 953, 962–63 (9th Cir.2005); *Helena Hunter & Anglers v. Tidwell,* 9:08–cv–162–DWM, 24–27, 841 F.Supp.2d 1129, 2009 WL 8555111 (doc. 26) (D. Mont. July 29, 2009). In each of those cases, the courts addressed the Forest Service's application of a hiding-cover standard. *Id.; Helena Hunter & Anglers,* 24 (doc. 26). The Forest Plans in both cases made clear that the unit of analysis for the hiding-cover standard was the "drainage or elk herd unit." *Id.* at 962; *Helena Hunter & Anglers,* 24 (doc. 26). Since that unit of analysis did not exclude private lands or other non-National-Forest lands, the courts concluded that the Forest Service could not exclude those lands when it applied the hiding-cover standard. *Id.* at 962–63; *Helena Hunter & Anglers,* 26 (doc. 26) ("[I]t is a violation of NFMA to exclude private lands." (citing *Native Ecosystems Council,* 418 F.3d at 962–63)).

Here, the Forest Service applied the road-density standard to two units of anal-ysis—the Project Area and the Ashland Ranger District. It did not apply the standard to private lands. Nor did it explain why it excluded private lands.[6] Hillis expressly stated that "[a]nalysis units should not be adjusted for land ownership; instead, they should reflect the cumulative habitat conditions perceived by elk." Given this dictate from its own scientists', the Forest Service's decision to exclude private lands was unexplained and so is arbitrary and capricious. *Idaho Sporting Congress,* 305 F.3d at 973–74. On remand and in its supplemental EIS, the Forest Service must present a reasoned discussion of why it analyzed only Forest lands and not adjacent private lands. *See id.* at 974.

#### e. Road density during Project implementation

The plaintiffs claim that the Forest Service violated NEPA by failing to analyze or discuss the increase in road density that will occur during the six- to ten-year duration of the Project. The Forest Service should have conducted that analysis.

At the heart of the plaintiffs' critique is the Forest Service's adoption of recommendations from Christensen et al. (1993) and Lyon and Christensen (2002). The discussion of the Christensen and Lyon research is puzzling. At one point in the Final EIS, the Service states that, based on Christensen et al. (1993), the open road density should be less than 1.9 mile of road per square mile. Yet, elsewhere in the Final EIS, it states that, based on Lyon and Christensen (2002), open road density should be less than 1 mile of road per square mile.[7]

---

6. It did, however, explain why it did not apply the standard to the larger, Hunting District ("HD") 704 area: "The majority of [Hunting District (HD) 704] is private land, and the HD is three to four times larger than the Ashland RD; analysis at the HD level would dilute effects of the project."

7. Christensen et al. recommend that "[f]or areas intended to benefit elk summary range and retain high use, habitat effectiveness should be 70 percent or greater." That recommendation translates to a road density of less than 1 mile per square mile.

Regardless of which standard applies, though, the Forest Service failed to analyze the effect of road density during the six- to ten-year duration of the Project. In the Final EIS, the Forest Service acknowledges that it will have to construct new, temporary roads for the Project:

Under Alternatives A, B, and C, approximately 18, 15, and 6 miles, respectively, of temporary roads are to be constructed. Temporary roads and associated motor vehicle traffic would result in short-term disturbance to elk for the life and the sale and associated activities (approximately 5–10 years). Temporary roads would not be open to public motor vehicle travel. Obliteration of temporary roads would mitigate post-harvest human disturbance from vehicle travel on these roads, though the resulting open non-forest corridor would tend to favor walk-in hunter travel. No alternative would result in new permanent roads in the BCLMP area. Christensen et al. (1993 P. 2).

Never discussed is what effect, if any, the temporary roads will have on either elk habitat or elk viability.

Neither the 1993 nor the 2002 papers from Christensen and Lyon suggest that temporary roads constructed during a timber sale are immune from concerns related to elk habitat and viability. Indeed, the opposite is true:

The studies—Hershey and Leege (1976), Ward (1976), Lyon (1979b), Edge and Marcum (1985b)—demonstrated that adequate security during the active period of a timber sale could mitigate much of the disturbance, whereas lack of security could result in undesirable displacement of elk to less desirable habitat or to undisturbed private land.

Nor does it matter that the temporary roads are closed to the public and open only for administrative use:

Any motorized vehicle use on roads will reduce habitat effectiveness. Recognize and deal with all forms of motorized vehicles and all uses, including administrative use.

Moreover, contrary to the Forest Service's suggestion, Lyon and Christensen never suggested that the only relevant time period for analyzing road density is during hunting season. Again, as the Forest Service scientists claim, "any motorized vehicle use" endangers elk habitat, even when it is for administrative purposes and even when it takes place during the off-season.

Since the Forest Service did not analyze the effect of road density during the duration of the Project, it acted arbitrarily because the Service "entirely failed to consider an important aspect of the problem." *Lands Council,* 537 F.3d at 993. The Forest Service must address this issue on remand in its supplemental EIS.

## II. Goshawk and old growth habitat

The plaintiffs argue that the Project violates NFMA and NEPA because it does not adequately protect goshawk and old growth habitat. Several arguments are set forth in support of their claim. They insist that: (1) the Forest Service has violated NFMA by failing to adopt a forest-wide, old-growth retention standard; (2) the Project does not adequately protect potential old growth habitat; and (3) the Project does not adequately protect goshawk post-fledgling areas and nest areas. Each of these arguments are for naught.

### A. Adoption of a specific forest-wide, old-growth retention standard

█ There is a claim that the Forest Plan violates NEPA and NFMA because it does not contain standards for old growth retention. The contention is empty because the Project does not involve or impact old growth habitat.

A forest-wide standard (or the absence of a standard) can not be challenged if the project does not trigger the application of that standard. *Wildwest Inst. v. Bull,* 468 F.Supp.2d 1234, 1246 (D.Mont. 2006), *aff'd,* 547 F.3d 1162 (9th Cir.2008), (citing *Neighbors of Cuddy Mtn. v. Alexander,* 303 F.3d 1059, 1067 (9th Cir.2002)). In *Wildwest Institute,* the plaintiffs claimed that the Forest Service's old growth standard did not sufficiently protect old growth species. *Id.* However the plaintiffs could not pursue the claim because the hazardous fuel reduction project at issue did not involve old growth timber:

> The Project is not an appropriate vehicle for Plaintiffs to challenge the Forest Plan's minimum old growth requirement. A Forest-wide management practice, like a Forest Plan's minimum old growth standard, cannot be challenged under the APA unless the practice renders a site-specific, project unlawful. *Neighbors of Cuddy Mountain v. Alexander,* 303 F.3d 1059, 1067 (9th Cir.2002). A plaintiff seeking to challenge a forest-wide management practice must demonstrate a relationship between the lawfulness of the challenged project and the forest-wide management practice. *Id.* at 1067–68. Plaintiffs cannot meet this burden with respect to the Forest Plan's minimum old growth requirement because the Project does not include treatment of any old growth habitat. ROD at 22; ROD at 11 (explaining Alternative 2 was modified to eliminate all treatment of old growth based on public comment).

*Id.* The Ninth Circuit affirmed. *Wildwest Inst.,* 547 F.3d at 1174 n. 7.

Here, the contention is that the Forest Service violated NEPA and NFMA by failing to adopt an old growth habitat retention standard. Nonetheless plaintiffs acknowledge that the Project Area "currently has 0% old growth forest habitat." Since the Project has no old growth habi-tat, there is no old growth to retain and the plaintiffs cannot question the Forest Service's failure to adopt an old growth retention standard. *Wildwest Inst.,* 468 F.Supp.2d at 1246; *see also* ("Although the Reynolds Report recommends maintaining a certain percentage of old growth in a goshawk's home range, it is significant that no old growth exists in the Project Area. As a result, the Jimtown Project is not capable of negatively impacting the old growth component of the Jimtown goshawk home range.")

Even so, the Forest Plan actually does contain old growth standards. Under the Forest Plan, the Forest Service manages old growth habitat by maintaining and improving habitat for the goshawk, a "management indicator species" for old growth. The Forest Plan has standards that are specific to three management areas—Management Areas G, M, and N—each of which are in the Project Area. In Management Area G, "Old growth will be managed to at least meet the habitat requirements for a minimum viable population of old growth dependent wildlife species." And in Management Areas M and N, "The habitat for old growth/snag cavity dependent species will be maintained."

The Forest Service is entitled to summary judgment on this issue-the plaintiffs cannot bring the claim. Furthermore the Plan has a old growth standards which negates the principle part of the argument.

**B. Protection of potential old growth habitat**

The plaintiffs next argue that the Project violates NFMA because it fails to protect mature forests that might eventually become old growth habitat. This contention fails too.

The argument is similar to one made in *Wildwest Institute.* There, the plaintiffs argued that "[a]lthough the Project will

not treat any old growth, ... the Project must be designed so as to not harm any soon-to-be old growth." 468 F.Supp.2d at 1246. In support of their position, plaintiffs cited *Lands Council v. Vaught,* 198 F.Supp.2d 1211 (E.D.Wash.2002), where the district court concluded:

> Although the challenged project did not involve the logging of any old growth, ... the Forest Service must demonstrate compliance with the Forest Plan's old growth standards and ensure that the mature trees logged under the project were not needed to fill any shortfall in the required old growth acreage.

*Wildwest Institute,* 468 F.Supp.2d at 1247 (citing *Lands Council,* 198 F.Supp.2d at 1225). The Court in *Wildwest Institute* concluded that the project at issue did not run afoul of *Lands Council* because the Forest Service had "made reasonable efforts to protect trees that may someday contribute to old growth." 468 F.Supp.2d at 1247.

On appeal, the Ninth Circuit did not address this "old-growth replacement" theory. 547 F.3d at 1174. Instead the circuit court held that even if a replacement requirement exists, the Forest Service satisfied the requirement by showing that habitat that might one day become old growth would be adequately protected in compliance with the Forest Service's old growth standards. *Id.* Even though the circuit court's decision in *Wildwest Institute* left open the old-growth-replacement theory, the circuit made clear that the standards in the forest plan—if any—drive the old growth analysis. 547 F.3d at 1173 ("NFMA does not ... mandate a specific old growth standard. Rather, such standards arise under the relevant Forest Plan.").

Here, the Forest Service has shown that the Project will reasonably protect habitat that could someday become old growth habitat. In its Record of Decision, the Service thoroughly explained that its "environmentally preferred alternative"—Alternative B—will improve goshawk habitat (and, thus, old-growth habitat) by making the Project Area more resilient to large, stand-replacing wildfires. The Project will also retain "more than 240 acres of no treatment around nest stands and alternate nest stands to maintain suitable habitat for goshawks and their prey."

There is no standard in the Forest Plan that requires protection of future or potential old growth. So the Forest Service did not violate NFMA by failing to address it. The Forest Service has sufficiently explained how the Project will improve old growth and goshawk habitat, and the plaintiffs have not shown how the Project violates the Forest Plan's old growth standards. The Forest Service is entitled to summary judgment on this issue.

## C. Goshawk post-fledgling areas and nest areas

 The plaintiffs next reason that Project does not comply with the goshawk-habitat recommendations advanced by Forest Service scientists. The plaintiffs are correct insofar as the existing post-fledgling area conditions do not comply with the recommendations. Nevertheless, the Project does not negatively impact those areas. The Project complies with the goshawk nest-area recommendations. As result, the Forest Service prevails on this issue.

The Forest Service, in its Final EIS, wrote that it relied on recommendations from Reynolds et al. (1992) and Brewer et al. (2009) to ensure that the Project maintained adequate goshawk habitat. Those recommendations are mandatory. *See Ecology Ctr.,* 430 F.3d at 1069–70; *cf. Ecology Ctr.,* 574 F.3d at 661; *Or. Natural Resources Council,* 109 F.3d at 527.

Reynolds recommends that: (1) goshawk nest stands be comprised of 100% old growth or mature forest, (2) post-fledgling areas be comprised of at least 20% old growth and 20% mature forest, and (3) the total goshawk nest area be 180 acres or larger.

Unlike Reynolds, Brewer recommends that goshawk nest stands be at least 240 acres.

There are two goshawk territories in the Project Area: Holiday Springs and Green Creek. The plaintiffs claim that neither of these areas meets the post-fledgling area recommendations or the nest area recommendations.

### 1. Post-fledgling areas

Contrary to the plaintiffs' position, Reynolds' recommendation that post-fledgling areas be comprised of at least 20% old growth and 20% mature forest does not apply to post-fledgling areas in Region 1 Forests. Brewer wrote:

> Reynolds et al. (1992) used VSS diameter classes to describe PFAs ["post-fledgling areas"] in the southwestern United States which are not readily comparable to the diameter classes present in R1. To compare Reynolds to the studies in the northwestern United States, it was necessary to combine VSS classes 4, 5, and 6 (Reynolds et al. 1992) into one size class (> 10″ dbh), which reflects mature and older forest in R1.

Brewer, then, modified Reynolds and asserts that 60% of the post-fledgling area must be either Mid–Aged Forest, Mature Forest, or Old Forest—that is, trees that are greater than 10 inches diameter at breast height (or greater than 12 inches diameter under Reynolds).

Despite this more forgiving, modified standard, the post-fledgling area recommendations are not met. In Holiday Springs, only 45 percent (1,126 acres) of the post-fledgling area is either Mid–Aged Forest, Mature Forest, or Old Growth Forest. And in Green Creek, the percentage is only 46 percent (829 acres).

Yet, even though the existing conditions do not meet the post-fledgling recommendations, the Project does not violate either NFMA or NEPA. The Service indicated that with Alternative B, its preferred alternative, it would maintain canopy cover in post-fledgling areas and would not treat nest areas. It also noted that "[w]ithin the goshawk [post-fledgling areas], the forested stands are being managed to develop 20% of the area as old growth stands over time."[8] Moreover, as the Forest Service explained, "Goshawk habitat is improved in the long term because the habitat is more resilient to large, stand replacement wildfire." *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1251 (9th Cir.2005) ("The long-term benefit of preventing stand-replacing fires, which completely destroy goshawk habitat, is preferable over any short-term benefit the goshawks might receive from retaining the dense forest structure in the project area.").

While the plaintiffs have shown that the existing conditions do not meet the post-fledgling area recommendations, they have not shown that the Project will make the conditions worse. Indeed, the Forest Service claims that the Project will actually improve conditions for post-fledgling areas. The plaintiffs' claim therefore fails. *See Native Ecosystems Council*, 428 F.3d at 1241 ("Although the Reynolds Report

---

**8.** Again, though, Reynolds' recommendation that post-fledgling areas be comprised of at least 20% old growth and 20% mature forest does not apply to post-fledgling areas in For-ests Region 1 Forests. Nevertheless, the Forest Service's wish to aspire to this more demanding standard will not harm goshawk habitat.

recommends maintaining a certain percentage of old growth in a goshawk's home range, it is significant that no old growth exists in the Project Area. As a result, the Jimtown Project is not capable of negatively impacting the old growth component of the Jimtown goshawk home range.... More pointedly, Native Ecosystems's concern that the Forest Service fails to demonstrate in the EA that it has set aside sufficient old growth habitat for goshawks ignores the very purpose of the Jimtown Project-creation of a landscape that permits large trees to mature into old growth."); *see also Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 440–43 (10th Cir.2011).

### 2. Nest areas

The Forest Service insists that, as with the post-fledgling area recommendation, the top three tree-size classes should likewise be combined for purposes of Brewer's recommendation for nest habitat. In other words, Mid–Aged Forest should be included in the calculation of available nesting area. When Mid–Aged Forest is included in the calculation, the nest area is greater than the recommended 240 acres in both Holiday Springs (1,126 acres) and Green Creek (829 acres).

Brewer does not expressly argue that the top three tree-size classes should be combined when assessing nesting areas, but, in his specific recommendations for the Custer National Forest, he recommends that the mean tree diameter be 9 inches or greater for nest areas. That diameter class includes the top three tree-size classes [9] and, as a result, there are more than 240 acres of nesting habitat in both Holiday Springs (1,126 acres) and Green Creek (829 acres).

More generally, the plaintiffs claim that the Forest Service is violating NFMA because the goshawk's habitat and population are declining on the Custer National Forest. As explained above the Project does not negatively impact goshawks in the Project Area. The preferred alternative—Alternative B—will purportedly improve goshawk habitat. Consequently, the Project does not violate NFMA on account of its impact on goshawks or their habitat. *See Native Ecosystems Council,* 428 F.3d at 1241, 1251.

### III. Stormwater discharge permits

The plaintiffs next maintain that the Forest Service violated NEPA because: (1) the draft EIS did not indicate that the Forest Service might need to obtain permits for the discharge of storm water from logging roads that would be built as a result of the Project and (2) the Forest Service did not ask the Montana Department of Environmental Quality to comment on those permits. Plaintiff is right on both counts.

### A. Identification of necessary permits

 40 C.F.R. § 1502.25(b) requires that "[t]he draft environmental impact statement shall list all Federal permits ... which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit ... is necessary, the draft environmental impact statement shall so indicate." On August 17, 2010, the Ninth Circuit held that "stormwater runoff from logging roads that is collected by and then discharged from a system of ditches, culverts, and channels is a point source discharge for which [a National Pollutant Discharge Elimination System

---

**9.** Under *Reynolds,* the top three tree-size classes consists of trees with a mean diameter of 12 inches or greater.

permit ("discharge permit" or "NPDES permit") under the federal Clean Water Act] is required." *N.W. Envtl. Def. Ctr. v. Brown,* 617 F.3d 1176, 1198 (9th Cir.2010), *withdrawn and superseded,* 640 F.3d 1063 (9th Cir.2011).

The Forest Service issued its Draft EIS about two months later on October 15, 2010. FS00671. It did not mention whether a discharge permit might be required, even though *Northwest Environmental Defense Center* made clear that one would likely be required.

At the time the Draft EIS was published, the Ninth Circuit's decision in *Northwest Environmental Defense Center* was binding on the Forest Service because the written opinion was published in August and was a final judgment as of that date. *See* Fed. R.App. P. 36. Moreover, the Ninth Circuit's amended opinion in *Northwest Environmental Defense Center,* which was published on May 17, 2011, did not change the stormwater-runoff rule. Consequently, the Forest Service overstepped 40 C.F.R. § 1502.25(b) and *Northwest Environmental Defense Center* by failing to identify the permits it might need to obtain for the stormwater discharge.

The Forest Service makes several counterarguments. First, it insists that any error was harmless because the Service stated in the Final EIS (issued in March 2011) that it might need to obtain a discharge permit. The omission is not harmless. By failing to issue the notification in the Draft EIS, as opposed to the Final EIS, the Forest Service occluded the opportunity for public comment on that aspect of the decision-making process. Such input is why the regulations require the Forest Service to issue the notification in the Draft EIS and not the Final EIS—to provide an opportunity for public comment. *See W. Watersheds Project v. Kraayenbrink,* 632 F.3d 472, 492–93 (9th Cir.2011) ("[P]ublic scrutiny [is] essential to implementing NEPA." (quoting 40 C.F.R. § 1500.1(b))).

Second, the Forest Service contends that it conducted a thorough analysis of potential stormwater discharge. That might be true, but that analysis is of little moment. Understanding the effects of the runoff is a different matter than understanding how the Forest Service must comply with federal and state law when managing those effects (e.g., by obtaining a discharge permit). The Service's failure to comply with a NEPA regulation goes beyond the "fly specking" that the Ninth Circuit found when the Service failed to consider a idiosyncratic state regulatory program for managing wetlands. *See Or. Natural Res. Council Fund v. Goodman,* 505 F.3d 884, 896–97 (9th Cir.2007). As the plaintiffs note, "The Project involves construction or reconstruction of 35.2 miles of roads in the Project Area with ongoing motorized use for five to ten years...." The Service should have given the public an opportunity to comment on the permits that might be necessary in order for it to construct and use the roads.

Finally, the Forest Service claims that even if a permit would ordinarily be required for the stormwater discharge, an exception applies here. It points to Section 429 of the Consolidated Appropriations Act of 2012, Pub.L. No. 112–74, 125 Stat. 786, 1046–47 (Dec. 23, 2011):

> From the date of enactment of this Act until September 30, 2012, the Administrator of the Environmental Protection Agency shall not require a permit under section 402 of the Federal Water Pollution Control Act (33 U.S.C. 1342), nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from roads, the construction, use, or maintenance of which are associated

with silvicultural activities, or from other silvicultural activities involving nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, or surface drainage.

Under this statute, then—which was enacted after the Ninth Circuit's decision in *Northwest Environmental Defense Center*—the Forest Service does not need to obtain a discharge permit for stormwater runoff from logging roads. There is an important caveat to this observation. The statutory exception applies only until September 30, 2012. After that date, a permit will be required under *Northwest Environmental Defense Center*, unless Congress takes action to extend the exception. Thus, the Forest Service's statement that no permit will be required for the Project is not necessarily true.

Since a discharge permit might be required, summary judgment in favor of the plaintiffs on this issue is proper. The Forest Service must address this matter in its supplemental EIS.

### B. Solicitation of comments from the State agencies

After an agency has prepared a draft EIS, it must "[r]equest the comments of ... [a]ppropriate State ... agencies which are authorized to develop and enforce environmental standards." 40 C.F.R. § 1503.1(2)(a)(i). The plaintiffs argue that the Forest Service failed to make this request.

In the Final EIS, the Forest Service lists all the federal, state, and local agencies that were consulted during preparation of the EIS. The Montana Department of Environmental Quality develops and enforces water quality standards. The Forest Service did not consult the Department. Nor is there any evidence in the record that it requested comments from the Department.

The Forest Service does not respond to this argument. By all accounts, the Service failed to abide by 40 C.F.R. § 1503.1(2)(a)(i). As a result, summary judgment in favor of the plaintiffs on this issue is proper. The Forest Service must request comments from the Department of Environmental Quality after it completes its draft supplemental EIS.

### IV. Exhaustion of the plaintiffs' claims

The Forest Service claims that the plaintiffs did not exhaust many of their claims because they failed to raise those claims in their administrative appeals. Not so. The plaintiffs have adequately raised their claims.

A person challenging a Forest Service action must "exhaust all administrative appeal procedures established by the Secretary [of Agriculture] ... before the person may bring an action in a court of competent jurisdiction...." 7 U.S.C. § 6912(e); *see also* 36 C.F.R. § 215.21. The Forest Service's administrative appeal procedures require that:

> [a]t a minimum, an appeal must include the following: ... (6) Any specific change(s) in the decision that the appellant seeks and rationale for those changes; (7) Any portion(s) of the decision with which the appellant disagrees, and explanation for the disagreement; ... and (9) How the appellant believes the decision specifically violates law, regulation, or policy.

36 C.F.R. § 215.14(b).

The Ninth Circuit has observed that there is no "bright-line test to determine whether a party has properly exhausted a claim to the Forest Service." *Buckingham v. Sec. of the U.S. Dept. of*

*Agric.,* 603 F.3d 1073, 1080 (9th Cir.2010) (citing *Idaho Sporting Cong.,* 305 F.3d 957, 965 (9th Cir.2002)). Instead, "[T]he determination must be made on a case-by-case basis." *Id.* (citing *Idaho Sporting Cong.,* 305 F.3d 957, 965 (9th Cir.2002)). Nevertheless the Ninth Circuit has also held:

> Although "claimants who bring administrative appeals may try to resolve their difficulties by alerting the decision maker to the problem in general terms, rather than using precise legal formulations," claimants are still obligated to raise their problem "with *sufficient clarity* to allow the decision maker to understand and rule on the issue raised."

*Id.* (quoting *Idaho Sporting Cong.,* 305 F.3d at 965). Moreover:

> "claims raised at the administrative appeal and in the federal complaint *must be so similar* that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, *the same claims* now raised in federal court."

*Id.* at 1081 (quoting *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 899 (9th Cir.2002)) (emphasis in original).

In their response brief, the defendants list seven different arguments that the plaintiffs purportedly did not exhaust. The record shows that the plaintiffs adequately put the defendants on notice of these claims in their administrative appeal. The seven arguments that the Forest Service claims are not exhausted are listed below, along with the citations to the plaintiffs' administrative appeals where they raise the claims:

> Argument A.1.b, Pls. Br. at 7–9. Claim that the Forest Plan violates NFMA because it allegedly contains no binding elk habitat standards.
> *See* FS029578, FS030463–FS030467.
> Argument A.1.c, Pls. Br. at 9–17. Claims that the Forest Service violated NEPA and NFMA by failing to "comply

with Hillis et al. (1991) and Christensen et al. (1993)," including each of Plaintiffs' specific arguments that the Project does not meet the individual "standards," "requirements," and "elements" of these papers. See, e.g., Pls. Br. at 14 (listing the Hillis "elements," that the Project analysis allegedly fails to address, as "hiding cover, elk herd home range, roads and cover on private and state lands within analysis unit, security estimate during project implementation, effect of closed roads").

> *See* FS029584, FS030463–FS030467.

> Argument A.2.a, Pls. Br. at 17–19. Claim that the Project violates NFMA because the Forest Plan has no "old growth habitat retention standard."

> *See* FS029558, FS030441–FS030447.

> Argument A.2.b, Pls. Br. at 19–20. Claim that the Project violates NFMA because there is "0% old growth left in the Project Area."

> *See* FS029558, FS030441–FS030447.

> Argument A.2.c, Pls. Br. at 20–23. Claims that the Forest Service violated NEPA and NFMA because "the Project does not comply with Reynolds et al. (1992) and Brewer et al. (2009)."

> *See* FS030447–FS030458, FS029578.

> Argument A.2.d, Pls. Br. at 24–26. Claim that the Forest Service is violating NFMA because the goshawk's "habitat and population" are declining on the Custer National Forest.

> *See* FS029551, FS029558, FS030447– FS030458.

> Argument B, Pls. Br. at 26–28. Claims that the Forest Service violated NEPA by failing to disclose its alleged requirement to obtain a National Pollutant Discharge Elimination System ("NPDES") permit in the Draft EIS, and by failing to request comments from the Montana

Department of Environmental Quality on the Draft EIS.

*See* FS029576–FS029577, FS029586.

Since the plaintiffs raised their claims below, they are entitled to summary judgment in their favor on the issue of exhaustion.

**V. The plaintiffs' Exhibits 1–15**

■■■ The defendants move to strike 15 exhibits that the plaintiffs filed in support of their motion for summary judgment. Those exhibits include: excerpts from various forest plans from forests other than the Custer National Forest (docs. 13–1 to 13–11 and 14–1 to 14–11), the Forest Service's wildlife report for the Whitetail Hazardous Fuels Project (docs. 13–12 and 14–12), pages from the Montana Natural Heritage Program website (docs. 13–13 to 13–14 and 14–13 to 14–14), and a Forest Service Memorandum discussing permitting requirements for stormwater discharge (docs. 13–15 and 14–15).

The defendants argue that these documents should be stricken because the documents are not part of the administrative record and the deadline for supplementing the administrative record—November 15, 2011—has passed. *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir.2000) ("When a plaintiff challenges a final agency action, judicial review normally is limited to the administrative record in existence at the time of the agency's decision.").

The plaintiffs filed their exhibits on November 12, 2011—before the supplementation deadline—but they did not move to supplement the record with those exhibits. They simply attached them to their Statement of Undisputed Facts and supporting brief.

The plaintiffs argue that, even though the Forest Service did not include the exhibits as part of the administrative rec-

ord, the exhibits are actually part of the administrative record because they were in the Forest Service's possession at the time it issued its decision. The argument is inadequate for at least two reasons.

■■■ First, even assuming the Forest Service should have included the exhibits in the administrative record it presented to the Court, the plaintiffs were still required to move to supplement the record with those exhibits in order for them to be considered. When a party claims that the administrative record presented by the agency is incomplete—that is, the agency failed to include documents that should have been included in the first place—the party must move to supplement the record if it wants the court to consider those documents. *See e.g. Portland Audubon Socy. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir.1993); *see also Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).

■■■ Nevertheless, if the agency fails to include documents in the administrative record that should have been included, the court will supplement the record with those documents can only be supplemented in "four narrowly construed circumstances":

(1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.

*Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir.2010). If the agency's omission is "harmless"— e.g., the information is already in the record or it is irrelevant to the court's deci-

**1228**

sion—then it is unnecessary to supplement the record or remand the case to the Forest Service to complete the record. *See e.g. Portland Audubon Socy.*, 984 F.2d at 1548; *Cabinet Resource Group v. U.S. Forest Serv.*, 2004 WL 966086 at *11 (D.Mont. March 30, 2004) ("While the documents 'might have supplied a fuller record, they do not address issues not already there,' and will not supplement the administrative record." (quoting *S.W. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1451 (9th Cir.1996)).

Here, the plaintiffs' exhibits must be stricken because the plaintiffs did not move to supplement the record. Even assuming that the Forest Service should have included the exhibits in the administrative record, that omission was harmless because there is no reason to consider or rely on the exhibits—as illustrated throughout this order, it is unnecessary to rely on any of the Exhibits in this decision. *See Cabinet Resource Group*, 2004 WL 966086 at *11.

Second, contrary to the plaintiffs' suggestion, the fact that the Forest Service possessed the exhibits at the time it made its decision does not make those exhibits part of the administrative record. The Ninth Circuit and other circuits have held that the administrative record consists only of documents and materials "directly or *indirectly* considered by the agency decision-makers":

The whole administrative record, however, is not necessarily those documents that the *agency* has compiled and submitted as the administrative record. The whole administrative record, therefore, consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position.

*Thompson v. U.S. Dept. of Labor*, 885 F.2d 551, 555 (9th Cir.1989) (citations and internal quotation marks omitted); *accord Ctr. for Biological Diversity v. Lubchenco*, 758 F.Supp.2d 945, 957 (N.D.Cal.2010) (quoting *Thompson* ). The plaintiffs have not shown that the Forest Service considered the exhibits and the Forest Service insists that it did not. Thus, even if the plaintiffs had timely moved to supplement the record, none of the exhibits are documents that are appropriate for supplementation.

■ The plaintiffs alternatively ask for judicial notice of Exhibits 1–15. A party cannot circumvent the rules governing record supplementation by asking for judicial notice instead of supplementation. *See Murakami v. U.S.*, 398 F.3d 1342, 1355 (Fed.Cir.2005) (affirming the district court's decision to not use judicial notice as a means "to circumvent the general rule against supplementing the administrative record."). When asking for judicial notice of documents in a case where the court is reviewing an agency action, a party must still satisfy one of the four exceptions to the general rule against supplementation. *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 976 (9th Cir.2006); *Rybachek v. U.S. E.P.A.*, 904 F.2d 1276, 1296 n. 25 (9th Cir.1990) (construing a motion for judicial notice as a motion to supplement the record); *see also Baker v. Barnhart*, 457 F.3d 882 (8th Cir.2006) (holding that the district court abused its discretion by taking judicial notice of documents not in the administrative record).

Since the plaintiffs did not timely move to supplement the record and neither of the four exceptions to the general rule against supplementation applies, there will be no judicial notice of the documents. *See Murakami*, 398 F.3d at 1355.

The defendants' motion to strike Exhibits 1–15 is granted.

CONCLUSION

For the reasons above, the Court grants in part both motions for summary judgment and denies them in part.

IT IS ORDERED that the motions for summary judgment (docs. 12, 18) are GRANTED IN PART and DENIED IN PART as to the plaintiffs' First and Third Claims for Relief. This matter is remanded to the Forest Service so that it may prepare a supplemental EIS that is consistent with this order and the law.

IT IS FURTHER ORDERED that plaintiffs' Second, Fourth, Fifth, and Sixth Claims for Relief are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the defendants are enjoined from implementing the Project while the proceedings required on remand are pending.

IT IS FURTHER ORDERED that the defendants' motion to strike (doc. 23) is GRANTED. The Clerk of Court is directed to strike from the docket Exhibits 1–15, which are attached to docket document numbers 13 and 14.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment in favor of the plaintiffs and defendants and close this case.