**FRIENDS OF THE WILD SWAN**
**and others, Plaintiffs,**

**v.**

**UNITED STATES FOREST SERVICE**
**and others, Defendants.**

**No. CV 11–125–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

July 11, 2012.

Geoff Hickcox, Western Environmental Law Center, Durango, CO, Matthew Kellogg Bishop, Western Environmental Law Center, Helena, MT, for Plaintiffs.

Daniel J. Pollak, U.S. Department of Justice, Washington, DC, Mark Steger Smith, Office of the U.S. Attorney, Billings, MT, for Defendants.

## ORDER

DONALD W. MOLLOY, District Judge.

The plaintiffs challenge the Lolo National Forest's proposed Colt Summit Project. Both parties move for summary judgment. The respective motions are granted in part and denied in part. The only viable claim presented is the Forest Service's failure to address past projects or actions in its cumulative effects analysis for lynx: my reasoning is set forth below.

### BACKGROUND

The Environmental Assessment (EA) for the Colt Summit Project proposes, among other things, 2,038 acres of commercial and non-commercial vegetation management, restoration of four miles of streamside road, construction of 1,300 feet of road, reconstruction of 5.1 miles of road, decommissioning of 25.2 miles of road, and noxious weed treatment along approximately 34 miles of road. After reviewing the EA, the Forest Supervisor issued a Finding of No Significant Impact (FONSI) for the project.

The plaintiffs now move for summary judgment, claiming there are a number of problems with the EA and FONSI. Many of the plaintiffs' claims concern lynx and lynx critical habitat. Generally speaking, the plaintiffs insist that the Forest Service's analysis of lynx and lynx critical habitat violates the National Forest Management Act (NFMA), the Endangered Species Act (ESA), and the National Environmental Policy Act (NEPA). They also reason that the Project will violate Forest Service standards because the Service intends to log within wetlands and designated streamside buffers. They further claim that the Service did not properly analyze the potential impacts of a nearby timber salvage project, the Summit Salvage Project. The defendants filed cross motions for summary judgment on the same issues.

### SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248, 106 S.Ct. 2505.

### ANALYSIS

The plaintiffs suggest that the Forest Service's analysis for the Colt Summit Project violates NFMA, NEPA, and ESA in several respects. By and large, though, the analysis is adequate and meets the requirements of the various acts. There is one viable claim—that the Forest Service breached its NEPA obligations by failing to analyze the Project's cumulative effects on lynx. The remedy in such circumstances is to remand this matter to the Forest Service so that it may properly consider cumulative effects on lynx and prepare a supplemental EA.

## I. The National Forest Management Act and the Forest Service's standards

The plaintiffs allege that the Project violates three Forest Service standards—two related to lynx and one related to streamside and wetland buffers. The record shows the Project violates none of the lynx or streamside and wetland standards.

### A. The National Forest Management Act

NFMA imposes both procedural and substantive requirements on the Forest

Service's management of national forests. *Hapner v. Tidwell*, 621 F.3d 1239, 1246 (9th Cir.2010). Procedurally, NFMA requires the Service to develop and maintain a comprehensive forest plan for each national forest. *Id.* (citing *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009)); 16 U.S.C. § 1604(a), (e). Once a plan is adopted, all subsequent agency actions and projects must comply with that plan. *Id.* (citing *Ecology Ctr.*, 574 F.3d at 656). Substantively, NFMA mandates the Forest Service adopt regulations aimed at protecting forest habitat and diversity of wildlife, among other things. 16 U.S.C. § 1604(g)(3). The plaintiffs bear the burden of proving that the Forest Service has violated its standards. *Envtl. Protec. Info. Ctr. v. Blackwell*, 389 F.Supp.2d 1174, 1219 (N.D.Cal.2004).

■ "The court's role in reviewing the Service's action is simply to ensure that the Forest Service made no clear error of judgment that would render its action arbitrary and capricious under NEPA." *Native Ecosystems Council v. Weldon*, 848 F.Supp.2d 1207, 1211–12 (D.Mont.2012) (citations and internal quotation marks omitted). A reviewing court must only ensure that the Service has not:

- relied on factors which Congress has not intended it to consider,
- entirely failed to consider an important aspect of the problem,
- offered an explanation for its decision that runs counter to the evidence before the agency, or
- offered an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (citing *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir.2008) (en banc), *overruled in part on other grounds as recognized by Am. Trucking Assns., Inc. v. City of L.A.*, 559 F.3d 1046 (9th Cir. 2009)).

## B. The VEG S6 standard

■ The Forest Service's VEG S6 standard is designed and intended to protect lynx. Generally speaking, it prohibits "[v]egetation management projects that reduce snowshoe hare habitat in multi-story mature or late successional forests."[1] Two points must be satisfied to trigger

---

1. *Standard VEG S6*

 **Where and to what this applies:** Standard VEG S6 applies to all vegetation management projects except for fuel treatment project within the wildland urban interface (WUI) as defined by HFRA, subject to the following limitation: Fuel treatment projects within the WUI that do not meet Standards VEG S1, VEG S2, VEG S5, and VEG S6 shall occur on no more than 6 percent (cumulatively) of lynx habitat on each administrative unit (a unit is a National Forest). For fuel treatment projects within the WUI see guideline VEG G10.

 **The Standard:** Vegetation management projects that reduce snowshoe hare habitat in multi-story mature or late successional forests may occur only:

 1. Within 200 feet of administrative sites, dwellings, outbuildings, recreation sites, and special use permit improvements, in-

cluding infrastructure within permitted ski area boundaries; or

 2. For research studies or genetic tree tests evaluating genetically improved reforestation stock; or

 3. For incidental removal during salvage harvest (e.g. removal due to location of skid trails).

 *Exceptions 2 and 3 shall only be utilized in LAUs where Standard VEG S1 is met.*

 (NOTE: Timber harvest is allowed in areas that have potential to improve winter snowshoe hare habitat but presently have poorly developed understories that lack dense horizontal cover [e.g. uneven age management systems could be used to create openings where there is little understory so that new forage can grow] ).

 (Lynx Management Direction, M16–21 FS014834.)

this standard: (1) the project has to take place in "multi-story mature or late successional forest" and (2) the project must "reduce snowshoe hare habitat." While there are exceptions to the VEG S6 standard, neither of the parties discuss or rely on them. Instead, the plaintiffs maintain the Project violates VEG S6 because the record shows that "multi-story mature" timber stands are slated for treatment. To support of their argument, the plaintiffs singly look to a watershed-level map showing that some of the treatments might take place in several multi-story mature stands. (*See* M16–39 FS015168.)

The Forest Service previously noted that this particular map shows that some treatments might take place in multi-story, mature stands. But, it explained, site-specific surveys showed that only two of the treatment units were actually multi-story, and those units do not meet the criteria for suitable lynx habitat:

> It is of note that VMAP analysis at the watershed scale depicts 668 acres of stands treated as potential lynx habitat and 125 acres as mature multi-storied. Site-specific stand exams revealed that only two units, 6 and 7, are mature multi-storied stands; however, these are dry sites and do not meet criteria for suitable lynx habitat.

(Wildlife Report, FS015217.)

The plaintiffs insist that the Silviculture Report for the Project shows that Units 6 and 7 are "moist" and not "dry sites." They are correct—the silviculture report does show that Units 6 and 7 are "moist." (*See* Silviculture Report, M11–29 FS012338). Even so, no evidence is provided to refute the Service's conclusion that the units (1) do not meet the criteria for suitable lynx habitat, (*see* Wildlife Report, M16–45 FS015217), and (2) do not provide quality snowshoe hare habitat, (*see* EA, A–1 FS000065).

The Forest Service explained that the stands slated for treatment "were becoming too mature (stem exclusion) to provide suitable snowshoe hare habitat." (Lynx and Grizzly Biological Assessment, K–26 FS001480.) It noted in addition that the Project will actually improve snowshoe hare and lynx habitat. (Wildlife Report, M16–45 FS015217.) The plaintiffs do not point to any contrary evidence. There is no record evidence that the Project will "reduce snowshoe hare habitat" (*see* VEG S6 standard) in Units 6 and 7. The treatment in these two units does not meet both prongs of the VEG S6 standard so as to trigger its application.

The plaintiffs fail to meet their burden of proving that the Project will violate the VEG S6 standard. They have not shown the Forest Service made a "clear error of judgment" when it concluded that the Project will not violate the standard. *See Native Ecosystems Council,* 848 F.Supp.2d at 1211–12. Consequently I am compelled to find the Project does not violate the standard.

### C. The ALL S1 standard

■ The ALL S1 standard in the Lolo Forest Plan directs the Forest Service to "maintain habitat connectivity [for lynx] in an LAU and/or linkage area." An "LAU" is a "Lynx Analysis Unit," which "is an area of at least the size used by an individual lynx, from about 25 to 50 square miles...." A "linkage area" is a distinct area that "provides connectivity between blocks of lynx habitat."

The plaintiffs claim the project violates the ALL S1 standard for 3 specific reasons. First, they insist the Service did not consider how logging on both sides of Highway 83 would impact the linkage area. Second, they allege the Forest Service applied the standard incorrectly because it

only evaluated whether linkage areas would be "significantly impacted" instead of "maintained." Finally, they reason that the Service failed to consider what impacts the Project would have on linkage areas outside the Project Area. None of theses arguments is viable in my view.

The Forest Service did consider how the Project would impact lynx travel. In its Wildlife Report, prepared in advance of the EA, it wrote:

> Two of the objectives pertain to lynx habitat connectivity. Lynx do not require dense forests as travel corridors, but use a variety of forest cover types. All treatments proposed would maintain the forested nature of the stands. However, conditions would be more heterogeneous than currently exist due to variable density retention and patches of irregular shaped shelterwood patch cuts. Movement to adjacent LAUs would not be significantly impacted by vegetation management activities proposed under this project. The forested nature of stands treated under the action alternative would remain intact, thus maintaining the suitability of these stands from the standpoint of lynx travel.

(Wildlife Report, M16–45 FS015219.) In the Environmental Assessment, the Service found that the project would have no effect on linkages or on connectivity. It explained that the "forested nature of stands would be retained" and "[r]oad densities would decrease." (EA, A–1 FS000064.) The impacts that the Project would have on lynx linkages and connectivity were considered and the Service concluded that there would be no significant impacts on either.[2]

A more fundamental problem with the plaintiffs first argument is that the Project does not appear to be in a linkage area. The plaintiffs rely on a large scale map from the Northern Rockies Lynx Management FEIS to show that the Project is within a linkage area. (*See* Linkage Map, M16–17 FS014436.) The linkage areas on the map were identified in 2003 and were described in the FEIS as follows:

> The lynx linkage areas are coarsely mapped at a broad scale, and *these maps should be considered the beginning point only.* We expect to further refine their locations as more information becomes available and as projects are proposed in these areas.

(Lynx Management Direction FEIS, M16–16 FS014259 (emphasis added).) The map does not lend itself to a precise determination of where the linkage areas are located. As the Service explained, it is only a beginning point and is subject to refinement with additional data.

The most recent data from Dr. Squires' research—which was relied on in the EA—show that lynx are not using the Project Area as a travel corridor. (*See* Lynx Maps, K–32 FS001547–54.) Dr. Squires wrote:

> [N]one of the collared lynx are shown to use the suggested lynx linkage area [i.e., the Project Area] as a crossing of HWY 83. The high quality crossing areas lie in the high quality spruce/fir habitats to the south of the Project near between Rainy and Seeley Lakes.

(*See* Lynx Maps, K–32 FS001553.) The most recent research shows the Project does not implicate the ALL S1 standard

---

2. The plaintiffs counter by pointing to notes from the Interdisciplinary Team that suggest the Project might negatively impact wildlife corridors. The notes read: "Project actions may negatively affect existing wildlife travel corridors—making them unsuitable." The notes, though, are only notes—they identify issues that the Forest Service had to consider. They do not represent conclusions that the Forest Service actually reached.

because there are no linkage areas in the Project Area.

The plaintiffs second argument—that the Service applied the standard incorrectly, is also lacking. The ALL S1 standard requires projects to "maintain habitat connectivity [for lynx] in an LAU and/or linkage area." The plaintiffs swear that the Service erred because it only considered whether connectivity would be "significantly impacted" instead of "maintained." (*See e.g.* Wildlife Report, M16–45 FS015219.) Connectivity is "maintained," because the Service concluded that the Project will not have a "significant impact" on connectivity. The terms are different sides of the same coin. It is the "heads you win, tails I lose" aphorism.

Finally, the plaintiffs hold that the Forest Service should have considered how "actions occurring outside the project area (and outside the LAU) but within the linkage area, i.e., Summit Salvage, Highway 83, and other logging projects, may impact connectivity." They do not cite any authority supporting this argument. The ALL S1 standard does not mean the Forest Service is obligated to consider the impacts of past projects that took place outside the Project Area. To the extent that the plaintiffs mean to maintain the Service did not consider the cumulative effects of the Summit Salvage Project, their argument is addressed in more detail below.

## D. The Inland Native Fish Strategy standards

■ The Inland Native Fish Strategy (INFISH) is a 1995 amendment to the Lolo Forest Plan. INFISH establishes treatment buffers around lakes, streams, and wetlands where logging might occur. Those buffers are, generally: (1) 300 feet for fish bearing streams, (2) 150 feet for non-fish bearing streams, (3) 150 feet for wetlands greater than one acre in size, and (4) 100 feet for wetlands less than one acre. The Service can alter these buffers based on "recommendations from a watershed analysis, stream reach, or site-specific review data that support the change."

Here, the plaintiffs argue that the Forest Service shrank buffers in the Project Area without first conducting the requisite analysis. They also claim that the Service plans to log timber directly within wetlands, in violation of the INFISH standards. The allegations are incorrect.

The Forest Service acknowledges that it reduced some of the INFISH buffers in the Project Area, but the INFISH standards allow the Service to do so. The buffers were altered in two ways. The Service changed (1) the buffer for fish-bearing streams from 300 to 150 and 50 feet, depending on tree size and (2) the buffer for wetlands from 100 or 150 feet to 50 feet, depending on tree size. (*See id.* at FS008802; EA, A–1 FS000031.) In its Aquatics Report, the Forest Service explained why it reduced the size of the buffers:

> Site-specific review in the summer of 2009 and 2010 by the fisheries biologist adjusted the RHCAs from 300 feet to 150 feet from the bank height for fish-bearing stream segments (Unnamed Tributary to Rainy Lake, unit 10 and 12). These adjustments are consistent with maintaining potential large woody debris and stream shade. As the adjacent terrain is relatively flat and high above the stream channel (high terrace), trees outside this distance cannot be considered potential large woody debris and do not provide for stream shading. These adjusted buffers are designed for trees that are greater and 6 inches dbh. Slashing of trees smaller than this diameter may occur up to within 50 feet of streams (see figure 2). A 50–foot–slash-

ing buffer from the streambank height is to provide a strip of vegetation to protect and maintain the existing amounts of angular canopy density as described in Beschta et al. (1987). Also, during this field review it was determined that the commercial and non-commercial buffers surrounding isolated wetlands could be adjusted from 100 or 150 feet to 50 feet based on the same principles described above.

(*Id.* at FS008802.) The Service complied with INFISH when it changed the buffers because it did so only after "site-specific review in the summer of 2009 and 2010." (*Id.* at FS008782, FS008802.)

The plaintiffs similarly object that the Project violates INFISH because the record has no site-specific "analysis, data, or rationale for shrinking the INFISH buffers." Their argument is futile because the Forest Service explained why it shrank the buffers.

"The court's role in reviewing the Service's action is simply to ensure that the Forest Service made no clear error of judgment that would render its action arbitrary and capricious under NEPA." *Native Ecosystems Council,* 848 F.Supp.2d at 1211–12 (citations and internal quotation marks omitted). The Supreme Court explained that, in order to avoid making an arbitrary and capricious determination, agencies "must examine the relevant data and articulate a satisfactory explanation for [their] action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn. of U.S. v. St. Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)); *see also Greater Yellowstone Coalition v. Lewis,* 628 F.3d 1143, 1156 (9th Cir.2010). The Service's explanation in the Aquatics

Report satisfies this requirement. *Native Ecosystems Council,* 848 F.Supp.2d at 1211–12.

The plaintiffs next insist that the Forest Service plans to cut trees directly within wetlands, with no buffers at all. In particular, they point to Units 10, 21, 22, and 44. The Forest Service at first planned to conduct "improvement cutting" and "underburning" in those areas. (EA, A–1 FS000017.) But, in response to public comments, it chose instead to conduct "understory slashing" and "prescribed fire" in those units. (EA Addendum, A–3 FS000135.)

The Forest Service expressly stated that, even though these particular units contain wetlands, the INFISH buffers will be applied to the existing wetlands. (*Id.* at FS000145.) According to the EA Addendum, "Boundaries of wetlands ... would be delineated prior to activities to exclude ground-based equipment and other activities." (*Id.*) These protections will be enforced within a 50–foot buffer around the wetland. (*Id.*) "No ignitions will be initiated inside these buffers." (*Id.*) But, "Fire will be allowed to creep into the buffer." (*Id.*) There is no showing a to how the Project, as amended in the EA Addendum, violates the INFISH standards for wetlands.

## II. Section 7(a)(2) of the Endangered Species Act

The plaintiffs next insist the Forest Service violated Section 7(a)(2) of the Endangered Species Act by inadequately analyzing the Project's effects on lynx and grizzlies and by failing to include the Summit Salvage Project Area in its analysis. This concern also misses the mark.

Section 7(a)(2) of the ESA requires agencies to consult with the Fish and Wildlife Service to ensure that any agency action "is not likely to jeopardize the con-

tinued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species...." 16 U.S.C. § 1536(a)(2). To make this determination, federal agencies may first engage in informal consultation with the Fish and Wildlife Service. 50 C.F.R. § 402.13(a). Informal consultation "includes all discussions, correspondence, etc., between the [Fish and Wildlife Service] and the Federal agency...." *Id.* Agencies may also prepare a "biological assessment" to determine whether the action will adversely effect the species or its habitat and whether formal consultation or a conference with the Fish and Wildlife Service is necessary. *Id.* at § 402.12(a).

If, during informal consultation or as a result of the biological assessment, the agency and the Fish and Wildlife Service agree in writing that the action "is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* at 402.13(a). An agency action "is not likely to adversely affect" a species "when effects on the listed species are expected to be discountable, or insignificant, or completely beneficial...." *S. Yuba River Citizens League v. Natl. Marine Fisheries Serv.*, 723 F.Supp.2d 1247, 1270 (E.D.Cal.2010) (citing Fish and Wildlife Serv. and Natl. Marine Fisheries Serv., *Endangered Species Consultation Handbook* 3–12 to 3–13 (1998)).

## A. Lynx

■ Here the plaintiffs reason the Forest Service failed to comply with ESA § 7(a)(2) because it did not analyze whether the Colt Summit Project would adversely modify lynx critical habitat. The assertion is belied by the record. The Forest Service went beyond its obligations under ESA § 7(a)(2) in drafting both a biological assessment that addresses lynx and lynx critical habitat and in engaging in informal consultation with the Fish and Wildlife Service.

On January 21, 2011, the Forest Service sent the Fish and Wildlife Service the Lynx and Grizzly Biological Assessment. (Lynx and Grizzly Biological Assessment, K–26 FS001473–FS001504.) The Assessment was specific to the Colt Summit Project. In it, the Forest Service concluded that the Project will "not adversely modify or adversely affect lynx critical habitat." (*Id.* at K–26 FS001490.) The Service reached this conclusion based on a finding that the Project complied with the standards in the 2007 Northern Rockies Lynx Management Direction, an amendment to the Forest Plan. (*Id.*) Earlier the Forest Service and the Fish and Wildlife Service had agreed that they would not need to engage in consultation under ESA § 7(a)(2) on a project-by-project basis if a project complied with the Forest Service's lynx standards. (*See* Programmatic Biological Assessment, M16–33 FS015193–FS015309; Programmatic Concurrence, K–18 FS001352–FS001357.) In other words, the agencies had programmatically determined that if a project complies with the Forest Service's lynx standards then the project is not likely to have an adverse effect on lynx or lynx critical habitat. This argument involves the "surrogate" approach to compliance that the plaintiffs refer to in their briefing.

The Fish and Wildlife Service reviewed the Lynx and Grizzly Biological Assessment. On February 9, 2011, an official with the Fish and Wildlife Service sent the Forest Service biologist an e-mail asking for more information on how the Project would affect lynx critical habitat. (Correspondence, K–32 FS001547.) Specifically, they wanted the biologist to complete a "PCE table." (*Id.*) PCE stands for "pri-

mary constituent elements" of lynx critical habitat, which are the physical and biological features that are essential to the survival and recovery of lynx. There are four primary constituent elements: "Boreal forest landscapes supporting a mosaic of differing successional forest stages" that contain "presence of snowshoe hares and their preferred habitat conditions" (PCE 1a), appropriate snow conditions (PCE 1b), denning sites (PCE 1c), and "matrix habitat" providing connectivity between denning and foraging sites (PCE 1d). (Lynx Critical Habitat Listing, M16–28 FS015012.)

The Forest Service answered the request and addressed each one of the elements, explaining why the Project would not have an adverse effect on lynx habitat. (Correspondence, K–32 FS001554.) Its explanation is supported by an in-depth analysis in the Wildlife Report. (Wildlife Report, M16–45 FS015209–23.)

On February 16, 2011, after examining the Forest Service's analysis of the primary constituent elements for lynx habitat, the Fish and Wildlife Service sent the Forest Service a written concurrence letter. (Lynx & Grizzly Concurrence Letter, K–33 FS001555–FS001557.) In it, they agreed that the Project would not likely have an adverse effect on lynx or lynx critical habitat and offered a lengthy explanation for its concurrence. (*Id.*)

The record shows the Forest Service met its consultation obligation under ESA § 7(a)(2). It drafted a biological assessment and it engaged in informal consultation regarding lynx and lynx critical habitat. *See* 50 C.F.R. §§ 402.12, 402.13. Both the Forest Service and the Fish and Wildlife Service found that the Project "is not likely to adversely affect" lynx or lynx critical habitat. *See id.* at § 402.14(b)(1). Consequently, no further action or consul-

tation was required by either agency. *Id.* at §§ 402.13(a).

The plaintiffs question at length the proposition that the Forest Service can use Forest Plan standards—such as the lynx standards—as a surrogate for the requirements under ESA § 7(a)(2). While interesting, the thesis misses the point. The record shows the Forest Service drafted a biological assessment specifically targeted at lynx and lynx habitat and it then engaged in further informal discussion specifically directed at lynx critical habitat. These actions meet the requirements of ESA § 7(a)(2). Neither the Forest Service nor the Fish and Wildlife Service ignored the effects that the Project might have on lynx or lynx critical habitat. There has been no showing of convincing argument or evidence that the agencies' analysis is flawed.

**B. The Summit Salvage Project Area**

■ The plaintiffs next insist the Forest Service violated ESA § 7 because it did not include the adjoining Summit Salvage Project in the "action area" of its analysis. The Forest Service did not analyze the Summit Salvage Project Area, but it did not violate ESA § 7 by failing to do so.

When assessing the impacts of a project, the Forest Service needs to look at those impacts within the "action area." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 901 (9th Cir.2002); 50 C.F.R. §§ 402.02, 402.12. The "action area" includes "all areas to be affected directly or indirectly by the Federal Action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. For NEPA the action area is isomorphic to the geographical scope of the cumulative effects analysis required by NEPA. *See* 50 C.F.R. § 402.02; *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, 390 F.Supp.2d 993, 1010 (D.Mont.2005).

"[T]he determination of the scope of an [action] area requires application of scientific methodology and, as such, is within the agency's discretion." *Dombeck,* 304 F.3d at 902. The agency needs to explain the "scientific methodology, relevant facts, or rational connections linking the project's potential impacts" to the action area. *Id.* at 902. In short, it must provide "articulable reasons [that] support[ ] the agency decision." *Alliance for the Wild Rockies v. Bradford,* 720 F.Supp.2d 1193, 1220 (D.Mont.2010) (quoting *Selkirk Conserv. Alliance v. Forsgren,* 336 F.3d 944, 958–60 (9th Cir.2003)).

In *Selkirk,* the Ninth Circuit upheld the Forest Service's decision to analyze the cumulative effects of granting an easement to a lumber company at the "bear management unit" level, which approximates the size of a female grizzly's home range. 336 F.3d at 958–60. The court observed that the Forest Service had explained that it chose to look only at the bear management unit of analysis because the topography and watersheds in the bear management unit were distinct from the other areas that the plaintiffs wanted the Service to include in the analysis. *Id.* at 959–60. Moreover, the agency explained that including the other project area in the analysis would have skewed the impacts. *Id.*

In this case, the Forest Service scope of analysis included: (1) 1996 watershed analysis of the Upper Clearwater, (2) 6th level HUC (hydrologic unit code) encompassing the proposed project area, (3) Clearwater Lynx Analysis Unit, and (4) Mission and Swan Grizzly Bear Subunits. (Wildlife Report, M16–45 FS015204.)

The Forest Service addressed the specific units of analysis for lynx and grizzlies. For the lynx, the Service concluded:

The Clearwater LAU comprises the cumulative effects analysis area for lynx under this project. This is an appropriate effects area because 19,794 acres is a sufficient size to consider how effects from the project could, when considered with other actions within the LAU, cumulatively effect the species and it is an accepted area for management considerations by lynx specialists.

(EA, A–1 FS000066; *see also* Lynx and Grizzly Biological Assessment, K–26 FS001489.) In other writings, in an interagency publication—*Canada Lynx Conservation Assessment and Strategy*—the agencies wrote:

We recommend that Lynx Analysis Units (LAUs) be identified for all areas with lynx habitat. LAUs are not intended to depict actual lynx home ranges, but are intended to provide analysis units of the appropriate scale with which to begin the analysis of potential direct and indirect effects of projects or activities on individual lynx, and to monitor habitat changes.

(Lynx Assessment Strategy, N1–340 FS025842.)

Considering grizzlies, the Forest Service analyzed the project's impacts within the Swan and Mission Subunits. (EA, A–1 FS000066–69; Lynx and Grizzly Biological Assessment, K–26 FS001491–FS001502; Wildlife Report, M16–45 FS015204.) In an Interagency Grizzly Bear Committee Taskforce report, the agencies explained that subunits "should be used for effects analysis" because they "approximate the size of annual home ranges of an adult female grizzly bear." (Interagency Grizzly Bear Committee Task Force Report, M16–6 FS013738–39.), The Ninth Circuit approved the Forest Service's selection of bear subunits as units of analysis in *Selkirk,* 336 F.3d at 960.

The Forest Service did not explain why it excluded the Summit Salvage area from its analyses. But it did not have to. It

does not need to explain why it excludes every imaginable area subject to possible analysis. It only needs to explain why it selected the units of analysis that it chose. In this case it did so with respect to both lynx and grizzlies.

### C. Grizzly bears

The plaintiffs argue, only in passing, that the Project will have the potential to adversely affect grizzly bears. They make no specific argument as to how the Forest Service's analysis about grizzlies somehow violates ESA § 7(a)(2). Instead, they make sparse, blanket allegations that grizzly bears will be harmed. The record is binding and it shows the Forest Service's analysis of grizzly bear impact does not violate ESA § 7(a)(2). (*See e.g.* Lynx and Grizzly Biological Assessment, K–26 FS001493–94, FS001499–FS001502; EA M2–28 FS006940.)

### III. NEPA

The plaintiffs next argue the Forest Service violated NEPA in several respects. First, they insist the Service predetermined the outcome of the EA—that is, an outcome that would ensure a FONSI. Second, they maintain the Service should have prepared an EIS. Finally they allege the Service's cumulative effects analysis is inadequate. All but one of these arguments fail. In my view, the Service did not adequately analyze the Project's cumulative effects on lynx when it overlooked past projects or actions.

### A. Predetermination

NEPA compels agencies to prepare an EA when the agency wants to take action that might result in environmental impacts. 40 C.F.R. §§ 1501.3, 1508.9. Based on the assessment, the agency then issues either a FONSI or an EIS. The agency prepares an EIS when "substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Cal. Wilderness Coalition v. U.S. Dept. of Energy*, 631 F.3d 1072, 1097 (9th Cir.2011) (citations and internal quotation marks omitted). If the agency determines that there are no substantial questions, then it may issue a FONSI. 40 C.F.R. §§ 1501.4, 1508.9.

■ "An agency cannot merely assert that its decision will have an insignificant effect on the environment, but must adequately explain its decision." *Cal. Wilderness Coalition*, 631 F.3d at 1097. The EA, then, is "an important contribution to the decision making process," 40 C.F.R. § 1502.5, and it "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) (citations omitted).

■ NEPA has no rule that an agency be "subjectively impartial," but the agency cannot predetermine the outcome of an environmental assessment. *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir.2000); *Defenders of Wildlife v. Hall*, 807 F.Supp.2d 972, 984–85 (D.Mont.2011); *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 712–19 (10th Cir.2010). In *Metcalf* the Ninth Circuit held that federal agencies had violated NEPA because they had "(1) prepare[d] an EA, (2) decide[d] that the ... proposal would not significantly affect the environment, and (3) issue[d] a FONSI, but [only] *after* already having signed two agreements binding them to support the ... proposal." 214 F.3d at 1142. As a result, the court reasoned, the agencies had "irreversibl[y] and irretrievabl[y]" committed to a particular outcome. 214 F.3d at 1143; *see Ctr. for Envtl. Law & Policy v. U.S. Bureau of*

*Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) ("The agency must complete an EA before the go-no-go stage of a project, which is to say before making an irreversible and irretrievable commitment of resources." (citations and internal quotation marks omitted)); *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717–19 (9th Cir.1988) (holding that the Forest Service violated NEPA by irreversibly and irretrievably awarding road-construction contracts prior to the completion of an EA and beginning construction of the roads prior to the preparation of a biological assessment).[3]

Consistent with *Metcalf* and *Save the Yaak*, another opinion in this court has held: "Those alleging predetermination have a high hurdle to clear. It only occurs when an agency has made 'an irreversible and irretrievable commitment of resources' based upon a particular environmental outcome, prior to completing its requisite environmental analysis." *Defenders of Wildlife v. Hall*, 807 F.Supp.2d 972, 984 (D.Mont.2011) (quoting *Metcalf*, 214 F.3d at 1143); *see also Forest Guardians*, 611 F.3d at 712–19.

■■■ Here, the plaintiffs claim that the Forest Service predetermined that the EA would result in a FONSI. The argument is based on meeting notes and language in the contract between the Service and TEAMS LLC, which the Service hired to help complete the NEPA analysis.

The Work Order between the Forest Service and TEAMS states that TEAMS will provide a "NEPA-sufficient [EA], Decision Notice/FONSI and project record." (Work Order, J–1 FS000970.) The plaintiffs argue that this language shows that

"TEAMS was … contractually obligated to prepare a FONSI for Colt Summit … a year before completion of the EA." The reasoning misses the mark. The contract language can easily be interpreted as requiring TEAMS to produce a Decision Notice *or* FONSI, not a Decision Notice *and* FONSI. The Decision Notice could be a finding of either significant environmental impacts (which would then trigger an EIS) or a finding of no significant impacts (which would result in a FONSI). The contract language does not lock the Service or TEAMS into a particular result. Moreover, the Work Order states the parties could modify the agreement at any time. (*Id.* at FS000966.) As a result, "[T]he agency never contractually obligated itself to a preferred course from which there was no turning back." *Defenders of Wildlife*, 807 F.Supp.2d at 984–85.

The various meeting notes do not show that the Forest Service predetermined a particular result. The plaintiffs rely on notes and a presentation from an April 27, 2010 meeting where the Forest Service explained that the Project will "have no significant issues so that a [FONSI] … can be written after the [EA]." (Meeting Notes, I–8 FS000926.) The Service also discussed how its staff should respond to comments on the EA: "EA should already have reached conclusions on significance. Write from that point and perspective, providing supporting evidence for no significance." (*Id.* at FS000939.) This language does not show that the Service predetermined it would issue a FONSI. It shows the Service was working to ensure the Project was designed to have no signif-

---

**3.** The Ninth Circuit later clarified that it will ordinarily find a NEPA violation only when "natural resources" have been irreversibly and irretrievably committed and not, for example, "financial resources." *WildWest Inst. v. Bull*, 547 F.3d 1162, 1168–1169 (9th Cir.

2008). So, while prematurely committing timber to a buyer in a timber sale might constitute predetermination, spending money to mark the trees for logging might not. *See id.*

icant impacts. The same meeting notes read:

**Project is designed to have No Significant Issues**

The forest has designed the project to have no significant issues so that a finding of no significant impact (FONSI) can be written after the environmental analysis (EA). If any [interdisciplinary team] member sees concerns about significant impacts alert the [interdisciplinary team] leader and Tim Love as soon as possible and suggest resolutions.

(*Id.* at FS000926; *see also id.* FS000939.) While the Forest Service wanted to design the Project so that it would have no significant impact and so that it could issue a FONSI, it did not obligate itself to issue a FONSI. To the contrary, it advised if significant impacts became apparent, then the interdisciplinary team would work to resolve them. Working toward a specific goal is not the same as predetermining a particular outcome. In this case there was no predetermination to issue a FONSI.

**B. EIS**

▆▆▆ An agency must prepare an EIS when "substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor." *Cal. Wilderness Coalition,* 631 F.3d at 1097 (citations and internal quotation marks omitted). Whether impacts are "significant" depends on both "context" and "intensity." 40 C.F.R. § 1508.27. "Context" refers to the setting of the action and "intensity" refers to the "severity of the impact." *Id.* When considering "the severity of the potential environmental impact, a reviewing agency may consider up to ten factors that help inform the 'significance' of a project...." *Ocean Advocates v. U.S. Army Corps of Engrs.,* 402 F.3d 846, 865 (9th Cir.2005); 40 C.F.R. § 1508.27(b) (listing factors); *see also Ctr. for Biological Diversity v. Natl. Highway*

*Traffic Safety Admin.,* 538 F.3d 1172, 1220 (9th Cir.2008). The plaintiffs maintain the Colt Summit Project implicates six of those ten factors. With one minor qualification, in my view, they are wrong.

In reviewing the Forest Service's treatment of the six, contested factors, it is necessary to keep in mind the court's role in reviewing the Service's actions. "The court's role in reviewing the Service's action is simply to ensure that the Forest Service made no clear error of judgment that would render its action arbitrary and capricious under NEPA." *Native Ecosystems Council v. Weldon,* 848 F.Supp.2d 1207, 1211–12 (D.Mont.2012) (citations and internal quotation marks omitted). It is important to ensure that the Service has not:

- relied on factors which Congress has not intended it to consider,

- entirely failed to consider an important aspect of the problem,

- offered an explanation for its decision that runs counter to the evidence before the agency, or

- offered an explanation that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (citing *Lands Council v. McNair,* 537 F.3d 981, 993 (9th Cir.2008) (en banc), *overruled in part on other grounds as recognized by Am. Trucking Assns., Inc. v. City of L.A.,* 559 F.3d 1046 (9th Cir. 2009)).

**1. Ecologically critical areas**

▆▆▆ Under 40 C.F.R. § 1508.27(b)(3), the Forest Service has to consider the proximity of the Project Area to "ecologically critical areas." *Helena Hunter & Anglers v. Tidwell,* 841 F.Supp.2d 1129, 1137–38 (D.Mont.2009). The plaintiffs argue that the Forest Service did not ade-

quately consider the impact of the Project on lynx critical habitat or the lynxes' use of the Project Area as a corridor for travel between the Bob Marshall and Mission Mountains.

In the EA, the Forest Service did, in fact, discuss the impacts that the Project would have on lynx critical habitat. The Service offered a long discussion of the impacts but it concluded that the Project will not have any significant impacts. (*See e.g.* EA, A–1 FS000063–66.) It reached the same conclusion in its FONSI. (FONSI, A–6 FS000256, 259.) The plaintiffs do not offer any reasoned explanation for why the Forest Service's analysis is inadequate and they have not explained how the project would have a "significant effect" on the lynx critical habitat. *See Presidio Golf Club v. Natl. Park Serv.*, 155 F.3d 1153, 1162 (9th Cir.1998).

Critical habitat aside, the plaintiffs maintain that lynx use the Project Area as a travel corridor and that the Forest Service did not consider the impacts that the Project would have on that corridor. In support of their argument, the plaintiffs point to several instances in the record where the Summit Divide—within which the Project Area is situated—is described as a linkage corridor for lynx that move between the Bob Marshall and Mission Mountains. The Forest Service, however, argues that the Project Area is not a corridor for lynx travel and that there is therefore no need to consider how the Project will impact lynx travel. The Forest Service has the better argument.

The Forest Service relies on GPS tracking data from Dr. Squires which shows detailed information about how lynx use the area. Dr. Squires' data tends to show that lynx do not use the Project Area as a corridor to travel between the Bob Marshall and Mission Mountains. What the data tends to show is that lynx cross High-way 83 south of the Project Area. This means the Project Area is probably not an "ecologically critical area" based on its use by the lynx as a linkage corridor.

Moreover, the Forest Service explained in the EA why the Project would not have any impact on corridors or linkages for grizzly bears, gray wolves, and lynx. (EA, A–1 FS000077.)

There is "no clear error of judgment" in the EA because the Service considered the impact that the Project would have on lynx critical habitat and, even though the Project Area is not in a lynx corridor, it concluded the Project would not have an impact on any corridors. *See Native Ecosystems Council*, 848 F.Supp.2d at 1211–12.

### 2. Wetlands

■ 40 C.F.R. § 1508.27(b)(3) requires the Forest Service to consider, in the EA, a project's proximity to wetlands. The plaintiffs assert the Forest Service plans to cut trees and conduct prescribed burns directly within wetlands in the Project Area. Yet, the plaintiffs claim, the Forest Service did not consider the Project's impacts on wetlands in the FONSI. They write that the FONSI "neglects to mention wetlands at all." (Pls.' Br., doc. 45 at 6.) A closer reading of the FONSI shows: "The modified proposed action will not impact ... wetlands ..." (FONSI, A–6 FS000258.) The Forest Service reached this conclusion because, as stated in the EA, "Wetland and riparian areas within the unit will not be treated." (EA, A–1 FS000014.) As set forth in its briefs, the Service is not going to conduct any cutting or burning in wetlands. Furthermore, buffers will be created around the wetlands. The Service did consider the impacts of the Project on wetlands in the Project Area and it determined there would be no significant impact because no

cutting or burning would occur in the wetlands (fires may be allowed to creep into the surrounding buffers, though (*see* EA Addendum, A–3 FS000145)). As a result, there is no "clear error of judgment" in the agency's consideration of wetlands in the Project Area. *See Native Ecosystems Council,* 848 F.Supp.2d at 1211–12.

### 3. Highly controversial and uncertain effects

 40 C.F.R. § 1508.27(b)(4), (5) compels the Forest Service to evaluate whether the effects of a project will be "highly controversial," "highly uncertain," or will "involve unique or unknown risks." In this case plaintiffs argue the Service should have prepared an EIS for the Project because the Project's effects are highly controversial and highly uncertain. Unfortunately for their claim the record does not support the argument.

 "A proposal is highly controversial when there is a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Helena Hunter & Anglers,* 841 F.Supp.2d at 1136 (quoting *Anderson v. Evans,* 371 F.3d 475, 489 (9th Cir.2004) (citation omitted)). "A *substantial dispute* exists when evidence . . . casts *serious doubt* upon the reasonableness of an agency's conclusions." *Humane Socy. of U.S. v. Locke,* 626 F.3d 1040, 1057 (9th Cir.2010) (quoting *Natl. Parks & Conserv. Assn. v. Babbitt,* 241 F.3d 722, 736 (9th Cir.2001)).

The Ninth Circuit has been careful to explain that not all projects with controversial or uncertain effects are "highly controversial" or "highly uncertain." *See Envtl. Protec. Info. Ctr. v. U.S. Forest Serv.,* 451 F.3d 1005, 1011 (9th Cir.2006); *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1240–41 (9th Cir. 2005). The court explained:

The use of the word "highly" in the NEPA regulations to modify "controversial" and "uncertain" means that information merely favorable to Native Ecosystems's position in the NEPA documents does not necessarily raise a substantial question about the significance of the project's environmental effects. Rather, as our explanation of the NEPA regulations makes clear, something more must exist for this court to label a project highly controversial or highly uncertain. Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain.

*Native Ecosystems Council,* 428 F.3d at 1240; *see also Envtl. Protec. Info. Ctr.,* 451 F.3d at 1011.

If the Forest Service was required to prepare an EIS any time a project was imbued with controversy or impacted a species, then that requirement would deter "candid disclosure of negative information." *Id.* Moreover, "[I]t does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment." *Id.* The fact "that a federal agency discloses adverse impacts on wildlife species or their habitat or acknowledges information favorable to a party that would prefer a different outcome" does not make the project "highly controversial" or "highly uncertain" in terms of its impacts. *Id.* at 1240–41.

Even conflicting scientific views do not render a project "highly controversial" or "highly uncertain" if the agency offers a "well-reasoned explanation" of why the disputed opinions to do not create a public controversy. *See Ind. Forest Alliance v. U.S. Forest Serv.,* 325 F.3d 851, 858 (7th

Cir.2003) (discussing various Ninth Circuit cases).

▮ When a party claims that the effects of a project are "highly controversial" or "highly uncertain," they must show evidence from experts or other "knowledgeable" individuals that a "a substantial dispute exists" regarding the agency's findings. *See Greenpeace Action v. Franklin,* 14 F.3d 1324, 1333–34 (9th Cir. 1992) (citation omitted). In the absence of such proof the challenger must show the agency failed to take a "hard look" at the project's effects. *Id.; see also Native Ecosystems Council,* 428 F.3d at 1241.

Here, the plaintiffs claim that the effects of the Project are highly controversial or highly uncertain because:

1. the Forest Service plans to engage in vista cuts and old-growth and mature-timber logging;

2. the Forest Service abandoned the INFISH buffers;

3. the Forest Service weakened road-density standards for grizzly bears; and

4. the Forest Service improperly downplayed the impacts to lynx and lynx critical habitat.

None of these reasons, though, give rise to a determination in this case that there are highly controversial or highly uncertain effects.

As discussed above, the Forest Service explained why it deviated from the normal INFISH buffers, and it adequately analyzed the Project's impacts on lynx and lynx critical habitat. The plaintiffs obviously disagree with Forest Service on these two issues, but, for the reasons discussed above, the related impacts are not seriously in dispute.

Second, the plaintiffs point to no part of the record to show there is a substantial dispute regarding the effects of the other matters—i.e., vista cuts, other logging, grizzly bears, or wetlands. They reason from blanket assertions that the Project's effects are highly controversial or highly uncertain. They present no record evidence to raise a substantial dispute. *Helena Hunter & Anglers,* 841 F.Supp.2d at 1136–37. Nor have they pointed to any evidence from experts or knowledgeable individuals, *see Greenpeace Action,* 14 F.3d at 1333–34, or shown that the Forest Service failed to take a hard look at the impacts.

**4. Listed species and critical habitat**

40 C.F.R. § 1508.27(b)(10) requires the Forest Service to consider the degree to which listed species and critical habitat might be impacted. The plaintiffs again insist the Forest Service failed to adequately consider the Project's impacts on lynx, lynx critical habitat, grizzlies, and bull trout.

As discussed above, the Service adequately considered the impacts on lynx, lynx habitat, and grizzlies. (EA, A–1 FS000063–70.) As to bull trout, the only part of the project that will have an impact is culvert removal and decommissioning of Road 646. Both the Forest Service and the Fish and Wildlife Service recognize that the culvert removal and road decommissioning will have a short-term impact on bull trout. But, in its Biological Opinion, The Fish and Wildlife Service explained that those actions will "reduce long-term sediment delivery by 77 percent" and "improve access to spawning and rearing habitat and thermal refugia." (Biological Opinion, K–29 FS001526.) As a result, the Fish and Wildlife Service determined the actions will help "restore" the Upper Clearwater sub-watershed. (*Id.*) The plaintiffs have apparently abandoned their argument regarding bull trout as they did not offer any response to the

Forest Service's discussion of bull trout and the Biological Opinion in their reply brief.

For all the reasons stated, the Forest Service adequately considered the Project's impacts on listed species and critical habitat.

### 5. Precedent

40 C.F.R. § 1508.27(b)(6) makes agencies consider "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." The plaintiffs claim, in very general terms, that the Forest Service's authorization of vista cuts and logging of old growth and mature forests in lynx critical habitat would establish a "dangerous precedent." While the issue is raised, they do not provide any reasoned support for their argument.

"The purpose of [40 C.F.R. § 1508.27(b)(6) ] is to avoid the thoughtless setting in motion of a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." *Presidio Golf Club*, 155 F.3d at 1162–63 (citations and internal quotation marks omitted). Preparation of an EA is "usually highly specific to the project and the locale, thus creating no binding precedent." *Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1140 (9th Cir.2011). Courts have therefore been reluctant to conclude that 40 C.F.R. § 1508.27(b)(6) provides an independent basis for preparing an EIS. *See id.; Town of Cave Creek v. FAA*, 325 F.3d 320, 332 (D.C.Cir.2003).

■■■ Here, the plaintiffs offer no reasoning about how the proposed actions will bind future decisions. The Forest Service conducted site-specific analyses, and there is no reason to conclude that the actions are anything but "highly specific to the project and locale, thus creating no bind-

ing precedent." *Barnes*, 655 F.3d at 1140. The Forest Service did not improperly fail to consider the Project's precedential effect.

### 6. Cumulative impacts

The Forest Service did not adequately analyze the cumulative effects of this project on lynx. This means that issue is remanded to the Forest Service so that it may conduct an adequate, not pro forma, cumulative effects analysis. Depending on that analysis, an EIS might be required.

### C. Cumulative effects

■■■ The plaintiffs claim that the Forest Service failed to take a hard look at the cumulative effects by not including the Summit Salvage Project in the analysis and failing entirely to conduct a cumulative effects analysis for lynx. The claim is two fold—the first part of it concerns the geographical scope of the analysis, and the second part deals with the substantive analysis itself. Setting aside whether the Service improperly excluded the Summit Salvage Project Area from the geographical scope of its cumulative effects analysis, the Service's substantive analysis for lynx is inadequate.

### 1. Exclusion of the Summit Salvage Project

Whether the Forest Service should have excluded the Summit Salvage Project from its cumulative effects analyses is a close question.

"NEPA requires an agency to consider cumulative effects, which result[ ] from the incremental impact of the action when added to other past, present and reasonably foreseeable actions regardless of what agency . . . or person undertakes such other actions." *Ctr. for Envtl. Law & Policy*, 655 F.3d at 1007 (citations and internal quotation marks omitted); *see also* 40

C.F.R. § 1508.7 (defining cumulative impacts in this way).

An important first step in this analysis is selecting the geographical scope of the analysis. Council on Envtl. Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* 8, 12–16 (CEQ 1997) (available at http://ceq.hss.doe.gov/publications/cumulative_effects.html). If a particular past, present, or future project is not in the geographical scope of the cumulative effects analysis, then the agency does not have to consider the cumulative effects of that project.

Under NEPA, courts "defer to an agency's determination of the scope of its cumulative effects review." *Selkirk*, 336 F.3d at 959 (quoting *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059 (9th Cir. 2002)). The geographical scope is not necessarily limited to the project's geographical boundaries. *See e.g. Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1077–78 (9th Cir.2002); *Considering Cumulative Effects* 8, 12. Nor is it limited to other administrative or political boundaries. *See id.* Instead, demarcation of the boundaries "requires a complicated analysis of several factors, such as the scope of the project considered, the features of the land, and the types of species in the area." *Selkirk*, 336 F.3d at 959; *see also Considering Cumulative Effects*, 12–16 (discussing in depth the factors that should be considered when determining the geographic scope of a cumulative effects analysis).

Agencies are not obligated to explain why they exclude every possible area that might be included in the cumulative effects area. Instead, they must justify on the record the chosen level of analysis. *Id.* at 958–60; *Alliance for the Wild Rockies*, 720 F.Supp.2d 1193, 1219 (D.Mont.2010).

Here, the Forest Service explained why it chose the areas that it did for cumulative effects analyses. It discussed, for example, the specific units of analysis for lynx and grizzlies. As to lynx, the Service concluded:

> The Clearwater LAU comprises the cumulative effects analysis area for lynx under this project. This is an appropriate effects area because 19,794 acres is a sufficient size to consider how effects from the project could, when considered with other actions within the LAU, cumulatively effect the species and it is an accepted area for management considerations by lynx specialists.

(EA, A–1 FS000066; *see also* Lynx and Grizzly Biological Assessment, K–26 FS001489.) In an interagency publication—*Canada Lynx Conservation Assessment and Strategy*—the agencies wrote:

> We recommend that Lynx Analysis Units (LAUs) be identified for all areas with lynx habitat. LAUs are not intended to depict actual lynx home ranges, but are intended to provide analysis units of the appropriate scale with which to begin the analysis of potential direct and indirect effects of projects or activities on individual lynx, and to monitor habitat changes.

(Lynx Assessment Strategy, N1–340 FS025842.)

As to grizzlies, the Forest Service analyzed the project's impacts within the Swan and Mission Subunits. (EA A–1 FS000066–69; Lynx and Grizzly Biological Assessment, K–26 FS001491–FS001502; Wildlife Report, M16–45 FS015204.) In an Interagency Grizzly Bear Committee Taskforce report, the agencies explained that subunits "should be used for effects analysis" because they "approximate the size of annual home ranges of an adult female grizzly bear." (Interagency Grizzly Bear Committee Task Force Report, M16–6 FS013738–39.) In *Selkirk*, the Ninth

1220

Circuit approved the Forest Service's selection of bear subunits as units of analysis. 336 F.3d at 960.

The Forest Service explained why it chose the units of analyses that it did. Since courts must "defer to an agency's determination of the scope of its cumulative effects review," *Selkirk*, 336 F.3d at 959 (quoting *Neighbors of Cuddy Mt.*, 303 F.3d 1059), here the Service did not improperly exclude the Summit Salvage Project from the geographical scope of its cumulative effects analysis.

### 2. Cumulative effects on lynx

Once an agency determines the geographical scope of its cumulative-effects analysis, it must analyze the incremental impact of the proposed project when added to past, present, and reasonably foreseeable actions within the selected geographical area. *Ctr. for Envtl. Law & Policy*, 655 F.3d at 1007; 40 C.F.R. § 1508.7. The plaintiffs in this case insist the Forest Service's cumulative effects analysis for lynx is inadequate. On this point they are correct. On remand the Forest Service must prepare a supplemental EA that adequately addresses the cumulative effects for lynx, and if necessary after that review, an EIS.

"Consideration of cumulative impacts requires some quantified or detailed information that results in a useful analysis, even when the agency is preparing an EA and not an EIS." *Id.* "An EA's analysis of cumulative impacts 'must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.'" *Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of Int.*, 608 F.3d 592, 603 (9th Cir. 2010) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir.2005)). "An agency may, however, characterize the cumulative effects of past actions in the aggregate without enumerating every past project that has affected an area." *Ctr. for Envtl. Law & Policy*, 655 F.3d at 1007.

When there is no EIS containing a cumulative effects analysis, "[T]he scope of the required analysis in the EA is correspondingly increased." *Kern*, 284 F.3d at 1077. "Without such information, neither the court nor the public ... can be assured that the [agency] provided the hard look that it is required to provide." *Te–Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 603 (citations and internal quotation marks omitted). Depending on what the cumulative effects analysis shows, the Forest Service might be required to prepare an EIS for the Project. *See* 40 C.F.R. § 1508.27(b)(7).

Here, the Forest Service did not discuss or mention any past projects or actions in its cumulative effects analysis for lynx. (*See* EA, A–1 FS000066.) In the EA, the Forest Service discusses how it recently acquired 640 acres of land owned by Plum Creek Timber Company. (*Id.*) It discusses the impact of snowmobile activity in the area. (*Id.*) But there is no discussion of past projects or activities. Even assuming there are no past projects or activities that would have a cumulative effect when considered along with the Colt Summit Project, the Forest Service must still "characterize the cumulative effects of past actions in the aggregate." *Ctr. for Envtl. Law & Policy*, 655 F.3d at 1007. Without that analysis, "neither the court nor the public ... can be assured that the [agency] provided the hard look that it is required to provide." *Te–Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 603 (citations and internal quotation marks omitted).

### CONCLUSION

For the reasons above, the Court grants in part both motions for summary judgment and denies them it part.

IT IS ORDERED that the motions for summary judgment (doc. 30, 36) are GRANTED IN PART and DENIED IN PART. Summary judgment is granted in favor of the plaintiffs on their claim that the defendants violated NEPA by failing to adequately analyze the Colt Summit Project's cumulative effects on lynx. Summary judgment is granted in favor of the defendants on all of the plaintiffs' other claims.

IT IS FURTHER ORDERED that this matter is REMANDED to the Forest Service so that it may prepare a supplemental environmental assessment consistent with this order and the law.

IT IS FURTHER ORDERED that the defendants are enjoined from implementing the Colt Summit Project while the proceedings required on remand are pending.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment and close this case.